## IN RE ALLISON.

1. HABEAS CORPUS — JURISDICTION OF TRIAL COURT.— If the trial court be not lawfully constituted, a trial and conviction are absolutely void. And the convict may be discharged upon *habeas corpus.*

2. COURT — DEFINITION OF — PLACE OF MEETING.— A court consists of "persons officially assembled under authority of law at the appropriate time and place for the administration of justice." The *place* of meeting is an important element in this definition.

3. COUNTY SEAT, AND ITS REMOVAL — QUESTIONING COURT PROCEEDINGS ON HABEAS CORPUS.— By statute "the district court is to be held at the "county seat;" but where the establishment and organization of the court are *de jure*, though the county seat was originally unlawfully removed to the place where the court is held, yet the proceedings of the tribunal cannot be annulled upon *habeas corpus* because of such unlawful removal.

4. PRIOR JEOPARDY — PLEADING.— The defense of prior jeopardy for the same crime should be presented by special plea to the trial court.

5. Same — Disagreement of Jury — Special Plea.— The constitution provides that "if the jury disagree * * * the accused shall not be deemed to have been in jeopardy." Unless it appears that the discretion of the trial court, in discharging the jury for failure to agree, has been grossly abused, the plea of prior jeopardy, even when properly interposed, will not avail.

6. Indictment Charging Distinct Offenses — Several Prosecutions and Convictions Permissible.— Indictments for robbing different passengers upon the same stage charge distinct offenses, and separate trials and convictions may be had thereunder. But, even if regarded as a single act, this act affects separate objects, and in such case there may be several prosecutions, though they spring from the same criminal transaction.

7. Grand and Petit Jurors Who Do Not Speak or Understand the English Language.— The fact that grand and petit jurors who do not speak or understand the English language concurred in finding the indictment and verdict is not fatal to the conviction.

## Original Application for Habeas Corpus.

Charles Allison was convicted in the district court of Conejos county on four indictments for highway robbery. Sentences were duly pronounced on each of the four convictions, whereupon he applied for a writ of habeas corpus.

Mr. H. B. O'Reilly, for petitioner.

The Attorney-General and Mr. H. Riddell, for the people.

Chief Justice Helm delivered the opinion of the court.

The most serious question presented in the case at bar rests upon a challenge to the legal existence of the trial court itself. If there was no lawful court, the pretended trial and judgment were absolutely void, and it would be idle to argue that a conviction, under such circumstances, could not be inquired into upon habeas corpus. Moreover, our habeas corpus statute implies clearly that the court itself must be lawfully constituted. And were

there doubt concerning the right to inquire, by this proceeding under the law and decisions elsewhere, into the legal existence of the court passing sentence, such doubt would be dispelled by the statute. Besides, the jurisdiction mentioned has already been entertained by this court. *Ex parte Stout,* 5 Colo. 509. The foregoing observations must not be understood, however, as applying to the case of *de facto* judges or other court officers.

The district court is created by the constitution, and its jurisdiction is therein defined. The office of district judge is in like manner established, and the title of the incumbent who tried the case at bar is not questioned. The statute organizing the sixth judicial district, in which Conejos county is situate, and providing for the terms of court therein, has never been challenged as unconstitutional, imperfect or ineffective.

Relator contends that because his trial was had at the town of Conejos, three-fourths of a mile distant from the town of Guadaloupe, the court was no court, and the conviction and judgment are absolute nullities.

The constitution is silent as to the place within the county where the district court is to perform its appointed work. The statute ordains that it shall be held at the "county seat;" but the "county seat," accurately speaking, is something separate and apart from the place where it is located, for both the constitution and statute provide for its removal from one place to another. And the term, as in common parlance applied to a particular town or city, simply designates the town or city where the county seat is for the time being established.

There may be a removal of the county seat *in fact,* though not in accordance with law. And it might be plausibly argued that, when such a removal takes place, the statute is satisfied if the court be held where the county offices are, and where the public business of the county is transacted. This is perhaps true, according to

the strict letter of the law; for the town to which the county seat is illegally removed becomes, temporarily at least, the place of its actual location; and the statute specifies no particular town by name, nor does it, in words, require the court to be held at the place where the county seat has been *regularly* and *legally* established. But this construction of the law is open to serious objection, and might lead to embarrassing results. We prefer to rest our decision upon broader, and, to us, more satisfactory grounds.

No issue is made with the definition usually given, that a "court" consists of "persons officially assembled, under authority of law, at the appropriate time and place, for the administration of justice;" nor is it denied that the *place* of meeting is an important element in the definition. We shall maintain the proposition that, under the admitted facts before us, there was a *de facto* location of the county seat at the town of Conejos, and that therefore the judgment under consideration is not vulnerable in the present proceeding.

For more than twelve years Conejos has been regarded as the lawful county seat. During this period, unquestionably, it has been the county seat in fact; that is, the county buildings, offices and records have, without exception, been at that place, and the county business, including that of the district and county courts, has all been transacted there. The people of the state and the different departments of the state government have recognized Conejos as the place where the county seat was lawfully established. No direct judicial proceeding has ever been instituted for the purpose of determining the legality of such location in fact, or for the purpose of restoring the county seat to Guadaloupe. On the contrary the inhabitants of the county, so far as we are advised, have universally acquiesced in this disposition of the county seat. During these twelve years property has been bought and sold, and public moneys have been ex-

pended in permanent improvements at the town of Conejos, upon the strength of its being the county seat. Estates of deceased persons have been there administered upon, and the interests of minor heirs have been there adjudicated. At that place property rights of all kinds have been litigated and determined, and criminals have been tried, convicted, sentenced and executed or sent to the penitentiary.

In this state the power to locate and remove the county seat is lodged by the constitution exclusively with the inhabitants of the county. They may, by a popular vote, establish or change the county seat at will, save that removals cannot be made oftener than once in four years. Their absolute power over the subject is restricted only by the limitation mentioned and the statutory regulations prescribing the manner of calling and conducting the election. The knowledge of the inhabitants of Conejos county that the county seat had in fact been removed from Guadaloupe and established at the town of Conejos cannot be questioned; nor can we presume that, while acquiescing during twelve years in the change, they have been ignorant of the manner in which it took place; and, since the entire control of the subject has always been in their hands, we are inclined to the view that their conduct in the premises should be treated as such a confirmation of the unauthorized transfer, or at least such a waiver of objection thereto, as justifies an application of the *de facto* doctrine, so far as judicial proceedings that have taken place under all the forms of law at the town of Conejos are concerned. This conclusion is re-enforced by the facts above narrated, showing a universal outside recognition of Conejos as the *de jure* county seat during the long period mentioned. We are aware of no principle of law that compels us to hold all such proceedings void, and thus entail the appalling consequences that would inevitably follow.

We do not hold that there may be a *de facto* court,

although this view has been vigorously and ably maintained. *Burt v. Railroad Co.* (Minn.) 4 Amer. & Eng. Corp. Cas. 426, and note. When a court or office is created by statute, and when the statute creating it is unconstitutional, there is no *de jure* court or office, as the case may be (*Ex parte Stout, supra*); and under such circumstances we have the highest authority for the view that there can be no *de facto* court or office. *Norton v. Shelby Co.* 118 U. S. 425.

But we are here dealing with a court unquestionably *de jure* so far as its establishment and organization are concerned,— a court presided over by a judge the legality of whose title and office are not challenged; and our position is simply that, though a county seat may have been originally unlawfully removed, yet subsequent circumstances may supervene which authorize the view that the proceedings of such a tribunal at the place of relocation are valid, and forbid litigating collaterally, by *habeas corpus*, the regularity of the removal.

The foregoing views do not conflict with those expressed in *Coulter v. Routt Co.* 9 Colo. 258. A general law exists, as already suggested, providing that the district court shall be held at the county seats of the various counties. The special act considered in the *Coulter Case* applied to the county of Routt alone. It provided for holding the terms of the district court at the town of Yampa, which was not and never had been the county seat. This court held that the act conflicted, in this respect, with the constitutional provision inhibiting special legislation "regulating county and township affairs." Thus it will be seen that the decision is not in conflict with the view that when the county seat itself is removed, though the removal be *de facto* merely, the place of holding the court may, under circumstances like those here presented, also be changed.

We turn now to the remaining questions argued by counsel for relator in the present case. It is extremely

doubtful if any of these questions are proper for consideration upon *habeas corpus;* but in view of the gravity of relator's situation, and the earnestness with which they are argued, the more serious of them will be briefly noticed.

It is asserted that relator's trial under indictment numbered 70 was absolutely void, for the reason that he had once before been in jeopardy. As to this objection we observe: *First,* that properly it should have been raised by special plea in the court below; *second,* that it is not well taken on the merits.

Relator's conviction took place upon his second trial. The record advises us that the jury in the first trial retired on a certain day for deliberation; that they were brought into court the next morning, asked if they had agreed upon a verdict, and answered that they had not. It then recites that since they were not likely to agree they were discharged by the court. Thus it appears that the jury had deliberated from one day until the next; that they were interrogated upon the probability of agreement by the court; and that before discharging them the court satisfied himself that agreement was impossible. Our constitution expressly provides that "if the jury disagree * * * the accused shall not be deemed to have been in jeopardy." Unquestionably the court should employ all legal and reasonable measures to secure a verdict after trial of a cause. On the other hand, however, the law inhibits the coercion of verdicts by improper punishment or influence. Discord exists upon the subject in hand among the adjudicated cases; but, under the foregoing constitutional provision, there can be no doubt as to the view we should favor. It is expressly declared that the jury, upon failure to agree, may be discharged without prejudice to another trial. It is obvious that the court must determine when a disagreement, sufficient to justify this discharge of the jury, exists. The length of

time during which they must deliberate, and the exact circumstances warranting the conclusion that they have failed to agree in a given case, are of necessity matters resting largely in the sound discretion of the court. No specific period can be designated, nor can any absolute rule be laid down, to control this discretion, and, unless it appears to have been grossly abused, the objection would not be ground for reversal upon error, much less for a discharge upon *habeas corpus.* See on this subject, Whart. Crim. Pl. & Pr. (9th ed.) §§ 504–506; *U. S. v. Perez,* 9 Wheat. 579.

It is further argued that three of the indictments upon which relator was sentenced were for one offense, and that for this reason two of the convictions, at least, were wholly illegal. The indictments are not before us, but there is sufficient in the record to convey the requisite information. Relator was not tried for robbing the stage; each of the indictments charged him with robbing a different individual passenger upon the stage. And no doubt can be entertained but that these various robberies were distinct offenses, although committed at the same place and in rapid succession. They constituted separate acts; but, even if regarded as a single act, they affected separate objects. And, " where one unlawful act operates on several objects, there may be several offenses committed, and so several prosecutions for the same criminal transaction, and an acquittal or conviction for one such offense will not bar a prosecution for the other." *Fox v. State,* 50 Ark. 528, 8 S. W. Rep. 836; Whart. Crim. Pl. & Pr. (9th ed.) § 468 *et seq.* The case at bar is to be distinguished from the case where an act operates upon a single object, and the different alleged offenses are simply degrees or ingredients of one crime. The present objection, like the former, would not even be ground for reversal upon error.

Finally, we are told that, since some of the grand and

petit jurors who found the indictments against relator and tried his cases were Mexicans, and did not understand the English language, there was not due process of law, wherefore his conviction is a nullity, and he should be discharged.

This question is *stare decisis* here.   *Trinidad v. Simpson,* 5 Colo. 65.   The reasoning in that case is clear and satisfactory; nothing would be gained by repeating it. The employment of an interpreter renders court proceedings more tedious and expensive.   This necessity is therefore to be deplored.   But a Mexican elector, unable to speak or understand any other language than the Spanish, may nevertheless possess all the qualifications for jury duty required by the constitution and statute; and, with the aid of an interpreter, he may perform the duties of juror better than many English-speaking citizens.   In certain counties of the state where the great bulk of the population originally were, and a very large proportion thereof still are, Mexicans, it would, for many years, have been practically impossible to have administered justice under our system of jurisprudence, without their aid in this capacity.

Since the decision above mentioned was rendered, the legislature has expressly declared that neither the county commissioners, the courts nor the judges shall "discriminate against, reject or challenge any person, otherwise qualified, on account of such person speaking the Spanish or Mexican language, and not being able to understand the English language." Sess. Laws 1885, p. 263. This statute might not be operative in the present case, for the reason that relator was tried before it took effect; but it is useful as indicating the view, upon the subject, of the law-making branch of the government. We know of no reason why it should be held void, and therefore, even were it proper to consider objections like the present upon *habeas corpus,* we would now be con-

strained, in an appropriate case, by legislative command, as well as by precedent, to deny their validity.

The writ is dismissed, and the prisoner remanded to the custody of the warden of the penitentiary.

*Writ dismissed.*

MR. JUSTICE HAYT, having conducted the trials of relator as prosecuting attorney, did not participate in this decision.