The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

Linda SCHWARTZ, Defendant-Appellee.

No. 81SA349.

Supreme Court of Colorado, En Banc.

March 5, 1984.

Rehearing Denied March 26, 1984.

---

Dale Tooley, Dist. Atty., O. Otto Moore, Asst. Dist. Atty., Brooke Wunnicke, Chief Appellate Deputy Dist. Atty., William Buckley, Deputy Dist. Atty., Denver, for plaintiff-appellant.

David F. Vela, State Public Defender, Jody Sorenson Theis, Deputy Public Defender, Denver, for defendant-appellee.

NEIGHBORS, Justice.

The People appeal the judgment of the trial court dismissing this case. First, they contend that the trial court erred in holding that section 18–6–401(1)(a), C.R.S.1973 (1978 Repl.Vol. 8 & 1983 Supp.), of the child abuse statute is unconstitutional. Second, the People argue that their decision to retry the defendant, after a mistrial was declared because the jury could not reach a unanimous verdict, does not constitute an abuse of prosecutorial discretion which justifies the dismissal of the information by the trial court. The People also seek review of certain evidentiary rulings made by the trial court.[1] The defendant claims that if we reverse the trial court's order of dismissal and remand the case for a new trial, her constitutional right against

1. In addition, the People argue that the trial court erred in giving instructions to the jury regarding mistake of fact as a defense. Since the propriety of such instructions is dependent upon the state of the record at the close of all the evidence in each case, we decline to address the issue.

being put in double jeopardy will be violated.

We conclude that section 18–6–401(1)(a) is constitutional, that the prosecution did not abuse its discretion in deciding to retry the defendant, and that the constitutional prohibitions against double jeopardy are not implicated. Accordingly, we reverse and remand for a new trial.

## I.

The defendant, Linda Schwartz, was charged by an information filed on February 24, 1981, with child abuse resulting in death.[2] The victim, Amanda Cruz, age 11 and ½ months, was brought by her mother, Christy Cruz, to the apartment of the defendant who was her babysitter on February 18, 1981, at 7:30 a.m. The child was taken to Denver General Hospital by ambulance at about 4:30 p.m. that afternoon because she had stopped breathing. She was kept alive by life support systems for several hours. However, she died when the support systems were disconnected the next day after her treating physician determined that she was "brain dead."

A police officer brought the defendant to the hospital on the evening of February 18th. While at the hospital, she made oral statements and provided a written statement to other officers after having been advised of her *Miranda* rights.[3] The statement, which was reduced to writing, was written by one of the officers and signed by the defendant. The statement related the following facts: Amanda cried from the time her mother left at 8:00 a.m. until about 10:00 or 10:30 a.m., when the defendant became angry and slapped the child's face as she was sitting on the floor. Amanda fell over sideways, then fell straight back, striking the wooden floor which was covered by carpeting. She stopped breathing, but began breathing again after the defendant "blew in her mouth" and "pushed on her stomach." The defendant then put Amanda down for a nap and the child slept for awhile, threw up, but went back to sleep. At 1:30 p.m., Amanda began crying again and the defendant took her out of the crib and put her on the living room floor. Later in the afternoon, at about 4:30 p.m., Amanda threw up again. When the defendant could not get Amanda's attention, she shook the child. Amanda's eyes were half-closed and seemed unfocused. When she stopped breathing, the defendant unsuccessfully attempted to revive her and then called for an ambulance.

At trial, the defendant testified that she was confused and in shock at the time she made the statements to the officers, and that her statements did not accurately portray the actual sequence of events. She testified that Amanda did not seem normal the whole day. When Christy Cruz brought the child to her, Amanda was listless and cried continually. The defendant testified that in the morning Amanda threw up before the defendant slapped her. She stated that the child did not stop breathing in the morning, rather she was gasping as though trying to catch her breath after the continual crying. The defendant said that Amanda only threw up once in the afternoon, not twice as related in her written statement.

The People's medical experts testified that Amanda died from edema (swelling) of the brain caused by trauma to the head. The medical testimony indicated that the time when the trauma which caused death could have been inflicted ranged from a few hours to a few days prior to the child's death.

---

**2.** Section 18–6–401(1), C.R.S.1973 (1978 Repl. Vol. 8 & 1983 Supp.).

The information alleges that the defendant, "did unlawfully, feloniously and knowingly and without justifiable excuse, cause and permit AMANDA MARIE CRUZ, a child under sixteen years of age to be placed in a situation that endangered said child's life and health, and cruelly punished said child which result-ed in the death of AMANDA MARIE CRUZ; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the People of the State of Colorado."

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The trial court permitted the defendant to introduce evidence, through cross-examination of Amanda's parents, Christy and Eleuterio Cruz, and direct examination of other witnesses, concerning Eleuterio's drinking, arguments between Christy and Eleuterio, and alleged abuse of Christy by Eleuterio. The trial court also admitted evidence regarding a prior incident when child abuse charges were filed against Eleuterio, but were later found to be groundless by the physician who examined the child.

The jury was unable to reach a unanimous verdict and the trial court declared a mistrial on May 26, 1981. On August 4, 1981, the trial court dismissed the case, holding that further prosecution of the defendant by the district attorney would be an abuse of discretion and that section 18–6–401(1)(a), C.R.S.1973 (1978 Repl.Vol. 8 & 1983 Supp.), is unconstitutional. The People then filed this appeal.

## II.

We first address the constitutional issue. The trial court held that section 18–6–401(1)(a) is unconstitutional on the ground that it denies the defendant her equal protection guarantees under the United States and Colorado Constitutions.[4] Section 18–6–401(1), C.R.S.1973 (1978 Repl.Vol. 8 & 1983 Supp.), states:

"*Child abuse.* (1) A person commits child abuse if he knowingly, recklessly, or through criminal negligence, and without justifiable excuse, causes or permits a child to be:

(a) Placed in a situation that endangers the child's life or health; or

(b) Placed in a situation that may endanger the child's life or health; or

(c) Exposed to the inclemency of the weather; or

(d) Abandoned, tortured, cruelly confined, or cruelly punished; or

(e) Deprived of necessary food, clothing, or shelter."

Section 18–6–401(7), C.R.S.1973 (1978 Repl. Vol. 8 & 1983 Supp.), provides:

"(7)(a)(I) When a person acts knowingly, *except as to paragraph (b) of subsection (1) of this section,* and the child abuse results in death to the child, it is a class 2 felony.

(II) When a person acts recklessly or with criminal negligence and the child abuse results in death to the child, it is a class 3 felony.

(III) When a person acts knowingly, *except as to paragraph (b) of subsection (1) of this section,* and the child abuse results in serious bodily injury to the child, it is a class 3 felony.

(IV) When a person acts recklessly or with criminal negligence and the child abuse results in serious bodily injury to the child, it is a class 4 felony.

(V) When a person acts knowingly or recklessly, *except as to paragraph (b) of subsection (1) of this section,* and the child abuse results in any injury other than serious bodily injury to the child, it is a class 1 misdemeanor.

(VI) When a person acts with criminal negligence and the child abuse results in any injury other than serious bodily injury to the child, it is a class 2 misdemeanor.

(b) An act of child abuse not otherwise specified in subparagraphs (I) to (VI) of paragraph (a) of this subsection (7) is a class 3 misdemeanor."

(Emphasis added.)

█ A statute is presumed to be constitutional and the party attacking its validity has the burden of proving unconstitutionality beyond a reasonable doubt. *See, e.g., People v. Rostad,* 669 P.2d 126 (Colo.1983); *People v. Albo,* 195 Colo. 102, 575 P.2d 427 (1978). However, "[a] statute which prescribes different degrees of punishment for the same acts committed under like circumstances by persons in like situations is violative of a person's right to equal protection of the law." *People v. Calvaresi,* 188 Colo. 277, 282, 534 P.2d 316, 318 (1975).

---

**4.** U.S. Const. amend. XIV; Colo. Const. art. II, § 25.

Under section 18-6-401(7), a person charged with knowingly violating section 18-6-401(1)(a) (placing a child in a situation which "endangers" the child's health) is subject to a greater degree of punishment than a person charged with a knowing violation of section 18-6-401(1)(b) (placing a child in a situation which "may endanger" the child's health).[5] The trial court, holding that there is no difference between conduct which "endangers" and that which "may endanger" a child's health, concluded that the two sections imposed different degrees of punishment for the same conduct and declared the statute "unconstitutional for lack of equal protection." We disagree.

We are concerned here with subsections (1)(a) and (b) of the statute. Each subsection includes a required culpable mental state (knowingly, recklessly, or criminal negligence) and the elements of "endanger" (in (1)(a)), or "may endanger" (in (1)(b)). However, the confusing statutory scheme also includes the penalty provisions enumerated in subsections (7)(a) and (7)(b). When subsections (1) and (7) are read together, we learn that the grade of the offense under the child abuse statutes is determined by the defendant's mental state and the result of the prohibited conduct.

■■■■ One might conclude from a reading of only subsections (1)(a) and (1)(b) that the provisions, "endanger" and "may endanger," are sufficiently distinguishable because "endanger" means imminent danger and "may endanger" means a reasonable probability of harm. We agree with this interpretation of the two terms. Using this limited analysis, it could then be determined that the equal protection guarantees are not implicated by the classification of conduct as that which "endangers" or "may endanger," even though the terms are overlapping. However, this framework ignores the culpable mental state element in subsection (1) and the proscribed result found in the penalty provisions of subsection (7). Regardless of the result, conduct

committed "knowingly" under subsection (1)(b) is always punished as a class 3 misdemeanor under subsection (7)(b). However, conduct which is reckless or committed through criminal negligence in violation of subsection (1)(b) and which results in death is a class 3 felony under subsection (7)(a). It is inconceivable that the legislature could have intended that knowing conduct, that "may endanger a child's life or health," resulting in the death of a child be classified as a class 3 misdemeanor, but if the conduct was reckless or criminally negligent, both lesser degrees of mental culpability under the Colorado Criminal Code, the offense is a class 3 felony. Therefore, we must interpret the entire statutory scheme governing child abuse in light of two cardinal rules of statutory construction. First, the legislature intended a just and reasonable result. Section 2-4-201(1)(c), C.R.S.1973 (1980 Repl.Vol. 1B); *Stephen v. City and County of Denver,* 659 P.2d 666 (Colo.1983); *U.M. v. District Court,* 631 P.2d 165 (Colo.1981). Second, courts have a duty to interpret statutes to uphold their constitutionality. *People v. Hoehl,* 193 Colo. 557, 568 P.2d 484 (1977).

We begin our analysis with the court's decision in *Hoehl,* 193 Colo. at 560, 568 P.2d at 486, in which we construed the phrase "may endanger" in the context of the child abuse statute then in effect (section 18-6-401(1)(a), C.R.S.1973; Colo.Sess. Laws 1971, ch. 121 at 448-49) to mean that "there is a reasonable probability that the child's life or health will be endangered." We went on to hold that the legislature may constitutionally punish conduct creating less than imminent danger. At the time *Hoehl* was decided, the provision defining child abuse included only the "may endanger" section, not both "may endanger" and "endangers" which now appear in the statute. After *Hoehl* was announced, the statute was repealed and reenacted. Colo.Sess.Laws 1980, ch. 93. In addition to adding the "endanger" provision, the legis-

---

**5.** A knowing violation of section 18-6-401(1)(a) is punishable as a class 2 felony, a class 3 felony, or a class 1 misdemeanor, depending on the result of the violation. A knowing violation of section 18-6-401(1)(b) is punishable as a class 3 misdemeanor. Section 18-6-401(7).

lature enacted the complex penalty provisions in subsection (7). Under the former statute, child abuse was a class 2 misdemeanor, but if the child suffered serious bodily injury, the offense was a class 5 felony. Clearly, the legislature intended to punish two separate and distinct types of conduct: (1) conduct placing a child in imminent danger ("endanger"), and (2) conduct creating less than imminent danger ("may endanger").

■ Under this analysis, subsection (1)(b) is not applicable to conduct which actually results in injury or death. If injury or death does result from the alleged child abuse, the victim must necessarily have been placed in a situation that "endangered" the child's life or health, and the perpetrator would be prosecuted under subsection (1)(a). We hold that subsection (1)(b) applies only to those cases in which the child did not suffer death or injury, but was placed in a situation which *may have* endangered (but did not actually endanger) his/her life or health. Neither injury nor death can result from the conduct proscribed by this subsection (if it does result, the conduct "endangered" the child's life or health); thus, the only possible punishment for conduct prohibited by subsection (1)(b) is found in subsection 7(b)—a class 3 misdemeanor. We are persuaded that by enacting subsection (1)(b) the legislature intended to punish conduct of placing a child in a dangerous situation, even though no harm to the child resulted.

■ Since we have construed subsection (1)(b) to be applicable only where there is no injury or death to the child, none of the punishment provisions in subsection 7(a) apply. Thus, the statute does not violate equal protection principles because the legislature did not prescribe different punishments for the same criminal act.

The effect of our decision in this case is to delete, by statutory construction, the "except" clauses in subsections 7(a)(I),

7(a)(III), and 7(a)(V). We conclude that the provisions of subsection 7(a) apply only when death or injury results; and subsection 7(b) applies only when no such result occurs. Since the conduct proscribed by subsection 1(b) does not result in death or injury, it is a class 3 misdemeanor under subsection 7(b), regardless of the defendant's mental state.

We hold that section 18–6–401(1)(a) does not violate equal protection because section 18–6–401(1)(b) only applies where no injury or death results from the alleged child abuse.[6]

### III.

The trial court also dismissed this case for the reason that it would be an abuse of prosecutorial discretion to retry the case.[7] In its written ruling, the court stated:

"It is puzzling to the Court why the District Attorney wants to try this case again. It is a certainty that a retrial of this case will not result in a conviction (assuming the same rulings on evidence).

"The case consumed two weeks of the Court's time and will again if there is another trial. Several experts testified. Witnesses were flown in from Texas and housed and fed for two weeks. Thousands of dollars were expended prosecuting and defending the case. It is the Court's view that it is an abuse of prosecutorial discretion to pursue this case further. For these reasons the Court will exercise a power it may not possess and will dismiss the case."

We hold that the trial court did not have the authority to dismiss the case on this ground.

■ The office of the district attorney is not a part of the judicial branch of government, rather it belongs to the executive branch. In *People v. District Court*, 632 P.2d 1022 (Colo.1981), we stated:

---

**6.** This case does not present the issue of when, if ever, section 18–6–401(1)(b) is a lesser included offense of section 18–6–401(1)(a), and we do not address the question.

**7.** In her briefs filed in the trial court and in this court, the defendant states that the jury voted 11 to 1 for acquittal. However, we find no support in the record for this assertion.

"As an executive officer charged with the duty to prosecute persons for violations of the criminal laws, [a district attorney] has a broad discretion in the performance of his duties.... The scope of this discretion extends to the power to investigate and to determine who shall be prosecuted and what crimes shall be charged. Generally, *his discretion in charging*, consenting to deferred prosecution, *or requesting dismissal* of pending charges under Crim.P. 48 *may not be controlled or limited by judicial intervention*."

632 P.2d at 1024 (emphasis added). *See also Myers v. District Court*, 184 Colo. 81, 518 P.2d 836 (1974); *People v. Dennis*, 164 Colo. 163, 433 P.2d 339 (1967); 1 *ABA Standards for Criminal Justice, The Prosecution Function* §§ 3–1.1 and 3–3.9 (2d ed. 1980).

Although we have held that conduct by a district attorney in retrying or refiling charges against a defendant may, in unusual circumstances result in a denial of the particular defendant's due process right to fundamental fairness,[8] the circumstances of this case do not justify judicial interference with executive discretion. For these reasons it was error for the trial court to dismiss the case, "[h]owever well intentioned the trial judge may have been in determining that further prosecution of the case was a useless and unnecessarily costly procedure." *Dennis*, 164 Colo. at 166, 433 P.2d at 340.

### IV.

Because a new trial is necessary and the issues will likely be raised upon retrial of

this case, we will address the People's argument that certain defense evidence should not have been admitted and the defendant's contention that retrying her would violate double jeopardy principles.

### A.

The People argue that evidence of alcohol abuse by Amanda's father and of physical fighting between her mother and father should not have been admitted because it was irrelevant and collateral to the issue of the defendant's guilt. In order to resolve this question and provide some guidelines which the trial court should follow when this case is retried, we first consider the applicable legal principles in light of the evidence in the record.

At trial the pivotal issue was whether the defendant or another person caused the injuries which resulted in Amanda's death. Amanda was in the defendant's exclusive custody for eight to nine hours before she stopped breathing. The child was in her parents' custody for the previous several days. The People's medical testimony established that the injuries which caused death could have been inflicted from four to six hours up to a few days before the child was taken to the hospital.[9] Therefore, the jury could have inferred that the injuries had been inflicted at a time or times when Amanda was not in the defendant's exclusive custody, but rather was within the custody of her parents.

██ The test to be applied in determining whether an accused may offer evidence that another person committed the crime

---

8. *See People v. Aragon*, 643 P.2d 43 (Colo.1982). In this case, during the first trial the district attorney failed to provide the defendant with alibi statements so a mistrial was declared. In the second trial, the district attorney introduced a false exhibit into evidence; the defendant was granted a new trial. In the third trial, the jury was deadlocked. By the time of the fourth trial, the defendant's alibi witnesses could no longer testify. This court held that the defendant was severely prejudiced by the delays and thus his due process rights were denied. *See also People v. Abrahamsen*, 176 Colo. 52, 489 P.2d 206 (1971), where the district attorney repeatedly filed essentially the same charges, then dis-

missed them and thereafter refiled the same charges. This court held that the defendant's due process rights were violated under those circumstances.

9. Dr. George I. Ogura, the forensic pathologist who performed the autopsy on Amanda, testified that the etiology of the trauma-induced injury which resulted in the child's death could occur over a period of time, "possibly a couple of days." Dr. Ogura also testified that the bruises he observed on the child's face were "probably the result of multiple episodes."

for which the defendant is being tried is found in *People v. Mulligan,* 193 Colo. 509, 568 P.2d 449 (1977). There we held that the defendant must first offer proof directly connecting the third person with the crime before evidence of that person's opportunity or motive to commit the crime becomes admissible. In the context of a child abuse prosecution, the fact that the victim was in the custody of the third person during the time when the injuries could have been inflicted is sufficient direct and circumstantial evidence to satisfy the *Mulligan* test. Since the evidence established that Amanda was in the custody of only three persons during the time frame when the death-producing injuries were inflicted, the question arises as to what direct or circumstantial evidence the defendant may offer concerning the conduct of Amanda's parents which may have caused or contributed to the child's death.

▮ In *People v. Bowman,* 669 P.2d 1369 (Colo.1983), we recognized that the confrontation clauses of the United States and Colorado Constitutions [10] require wide latitude in cross-examination. We stated: "[A] court must allow broad cross-examination of a prosecution witness as to bias, prejudice and motivation for testifying." 669 P.2d at 1375. Where the defendant's theory of the case and evidence suggests, in her view, that the child's parents inflicted the injuries, the principles announced in *Bowman* are applicable. We stated the following limitations in *Bowman:*

> "A trial court, however, must disallow cross-examination upon matters wholly irrelevant and immaterial to the issues at trial, ... and has broad discretion to preclude repetitive and harassing interrogation."

669 P.2d at 1375.

▮ Evidence is relevant when it renders a claimed inference more probable than it would be without it. *People v. Lowe,* 660 P.2d 1261 (Colo.1983). C.R.E. 401 defines relevant evidence as: "[E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A trial judge has broad discretion in determining the relevancy of evidence and if the evidence "has probative value in determining the central issue in dispute, the trial court's decision will not be reversed unless it is shown that there was an abuse of discretion." *Lowe,* 660 P.2d at 1264.

There are three categories of evidentiary facts which the People claim are irrelevant: (1) the history of alcohol abuse by the child's father which prompted his physical abuse of the mother for several years; (2) the complaint by the mother against the father for child abuse against Amanda in June of 1980; and (3) the testimony of a witness, Pat Riley, who said that during the weekend before the child died, she saw a plate being thrown out the door of the apartment in which the child and her parents lived, heard cursing, and observed the mother run down the stairs in the apartment complex while holding Amanda and saw the child strike her head on a metal railing.

▮ In applying the legal principles to the evidence in the record, we are persuaded that the testimony concerning the parents' domestic violence given by witnesses who observed the situation during the weekend prior to the child's death was properly admitted. Such evidence is relevant because it supports the inference that the child could have been injured by either or both of her parents during any one of the incidents described by the witnesses. On the other hand, if the medical testimony conclusively established that the injuries to Amanda which caused her death had been inflicted within a few hours prior to the time she went into unconsciousness, then the evidence of domestic violence would not be admissible because the child was within the defendant's exclusive care and custody for the entire period.

We decline to address further the rulings made by the trial court on the admissibility

**10.** U.S. Const. amends. VI & XIV; Colo. Const. art. II, § 16.

of the specific evidence relating to other acts of domestic violence between the mother and the father which occurred during incidents not temporarily related to the time when the fatal injuries were inflicted upon the child. Because of the somewhat confusing state of the record and the uncertainty as to what foundation might be laid as a predicate to the admissibility of such evidence at retrial, we think it inadvisable to suggest any criteria other than those contained in the Colorado Rules of Evidence and the broad standards set forth in this opinion. In our view, whether evidence of domestic violence is relevant depends on the facts and circumstances of each case. Based on the record before us, we are unable to develop any litmus test generally governing the admissibility of acts of domestic violence in criminal cases involving charges of child abuse.

■ The mother's specific complaint concerning an act of child abuse allegedly directed toward the child by the father is relevant evidence. *See People v. Harris*, 633 P.2d 1095 (Colo.App.1981). The complaint was made by the mother to the police in June of 1980, eight months before the death of the child. It is true that the child was examined by a physician who found no evidence of abuse and that the mother later said she made the complaint because she was "mad" at the father. However, these are factors which affect the weight rather than the admissibility of the evidence. Moreover, the record reflects that the family was kept under the supervision of the Denver County Department of Social Services until December of 1980, just six weeks before the child died.

■ Finally, the evidence presented by Pat Riley is also admissible. The People's principal objection to her testimony is that she could not say that she *actually* saw the child's head strike the metal railing. Ms. Riley said she saw the child being held by her mother, observed the mother run down the stairs, saw the child's head in close proximity to the railing, and heard the child begin to cry after the mother and child had passed by the railing. Ms. Riley testified that the child's head hit the railing. However, on both *voir dire* and cross-examinations, Ms. Riley conceded that she "assumed" the child's head had struck the railing, based on her observations as described above. The People's objection merely goes to the weight of the testimony, not to its admissibility.

## B.

The defendant claims that a ruling ordering her to stand trial again would violate the constitutional prohibition against placing an accused twice in jeopardy for the same offense.[11] She claims that there was no manifest necessity justifying the trial court's decision to declare a mistrial. We disagree.

■ The policy consideration which is basic to double jeopardy protection is that the government should not be given repeated chances to obtain a conviction of an accused:

"The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

*Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199, 204 (1957). *See also United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *Ortiz v. District Court*, 626 P.2d 642 (Colo. 1981); *People v. Baca*, 193 Colo. 9, 562 P.2d 411 (1977).

■ A controlling principle embodied in double jeopardy protection is that the ac-

---

**11.** U.S. Const. amends. V & XIV; Colo. Const. art. II, § 18.

cused is entitled to have his trial completed by a particular tribunal. *Ortiz*, 626 P.2d at 646; *Baca*, 193 Colo. at 11, 562 P.2d at 412. However, where a trial court properly declares a mistrial, the criminal trial may be terminated before the issue of the defendant's guilt has been resolved by that particular tribunal. *Ortiz*, 626 P.2d at 646.

■ The United States Supreme Court has articulated a manifest necessity test for determining when a mistrial is properly declared:

> "We think, that in all cases of this nature, the law has invested courts of justice with authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all of the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to find all the circumstances, which would render it proper to interfere."

*United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). In effect, the manifest necessity test protects the defendant against bad faith conduct by the judge or prosecutor which results in a mistrial being declared and gives the prosecution a more favorable opportunity to convict the defendant. *Dinitz*, 424 U.S. at 611, 96 S.Ct. at 1081.

■ Since the *Perez* decision was announced, it has been settled that manifest necessity exists and a criminal trial may be terminated if the jury is deadlocked and cannot reach a verdict. The re-prosecution of an accused in such a case is not barred by double jeopardy principles. *United States v. Sanford*, 429 U.S. 14, 97 S.Ct. 20, 50 L.Ed.2d 17 (1976); *Ortiz*, 626 P.2d at 646. In order for this rule to apply, the mistrial must be properly declared, i.e., the jury must actually be unable to reach a verdict.

■ The determination of whether to declare a mistrial is a matter within the sound discretion of the trial court and will not be disturbed on appeal, absent an abuse of discretion which prejudices the defendant. *Massey v. People*, 649 P.2d 1070 (Colo.1982); *People v. Sexton*, 192 Colo. 81, 555 P.2d 1151 (1976); *Barriner v. District Court*, 174 Colo. 447, 484 P.2d 774 (1971). In determining whether the jury is unable to reach a unanimous verdict and thus whether a mistrial should be declared, the trial court should consider the following factors: (1) the jury's collective opinion that it cannot agree; (2) the length of the trial; (3) the complexity of the issues; (4) the length of time the jury has deliberated; (5) whether the defendant has made timely objections to a mistrial; and (6) the effects of exhaustion or coercion on the jury. *See* 21 Am.Jur.2d *Crim.Law* § 303 (1981). As we stated in *Barriner*, 174 Colo. at 453, 484 P.2d at 776:

> " 'Unquestionably the court should employ all legal and reasonable measures to secure a verdict after trial of a cause. On the other hand, however, the law inhibits the coercion of verdicts by improper punishment or influence. Discord exists upon the subject in hand among the adjudicated cases; but, under the foregoing constitutional provision, there can be no doubt as to the view we should favor. *It is expressly declared that the jury, upon failure to agree, may be discharged without prejudice to another trial. It is obvious that the court must determine when a disagreement, sufficient to justify this discharge of the jury, exists.* The length of time during which they must deliberate, and the exact circumstances warranting the conclusion that they have failed to agree in a given case, are of necessity matters resting largely in the sound discretion of the court. No specific period can be designated, nor can any absolute rule be laid down, to control this discretion, and, unless it appears to have been grossly abused, the objection would not be ground for reversal upon error.' "

(Quoting *In re Allison*, 13 Colo. 525, 531–32, 22 P. 820, 822 (1889) (emphasis in original).)

In the present case, the facts show that the trial court did not abuse its discretion by declaring a mistrial. The jury began deliberations on Thursday, just before lunch, and deliberated until 5:00 p.m. They deliberated all day Friday and on Saturday until 1:00 p.m. Saturday morning the jury sent the judge a note stating:

"The jury has been in deliberations since noon on Thursday without reaching a unanimous verdict. At the present point, we feel that no substantial progress has been achieved, and the vote is unchanged since Friday morning. At this point some feel that more can be said, but all agree that little or no progress has been made since yesterday morning.

"We would ask the court for instructions, since we feel that it is virtually impossible to reach a unanimous verdict.

"This statement was agreed to unanimously."

The jury was then sent home and returned on Monday at 8:30 a.m. and deliberated until about 10:30 a.m. At that time, the jury members again stated that they were unable to reach a unanimous verdict, that they felt they had made no progress, and, that they did not believe it would be possible to reach a unanimous verdict. The judge then declared a mistrial over the defendant's objections.

The defendant argues that there was no manifest necessity because the trial court refused to give the modified *"Allen* charge" to the jury when asked to do so by the defendant. On September 22, 1971, the Chief Justice of the Colorado Supreme Court issued a directive forbidding the use of the *Allen* charge and prescribing a new instruction. The directive states:

"IT IS HEREBY ORDERED that the 'Allen' Instruction, otherwise known as the Third Degree Instruction, be no longer given to juries in trials conducted in this state. If it appears that a jury has been unable to agree, the trial court may *in its discretion* require the jury to continue its deliberations and may give an instruction which informs the jury that:

"1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment;

"2) Each juror must decide the case for himself, but only after an impartial consideration with his fellow jurors;

"3) In the course of deliberation, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

"4) No juror should surrender his honest conviction as to the weight and effect of the [evidence] solely because of the opinion of his fellow jurors or for the mere purpose of returning a verdict.

"A jury shall be discharged by the trial judge without having agreed upon a verdict *if it appears to the trial judge that there is no reasonable probability of agreement."*

(Emphasis added.) Apparently, this is the "modified *Allen* charge" that the defendant requested. We note that the directive states that the giving of this instruction is within the trial court's discretion. Moreover, the instruction may be given only in narrowly prescribed circumstances. The trial court must first determine whether there is a likelihood of progress towards a unanimous verdict upon further deliberations. *See People v. Lewis,* 676 P.2d 682 (Colo.1984). The court must then exercise its discretion in deciding whether the instruction should be given.

There is a compelling concern that the jury not be coerced into rendering a verdict. *People v. Lewis,* 676 P.2d 682 (Colo.1984); *Allen v. People,* 660 P.2d 896 (Colo.1983). A court cannot sanction a verdict "which is reached by some members of the jury sacrificing their conscientious opinions merely for the sake of reaching an agreement." *Lowe v. People,* 175 Colo. 491, 494, 488 P.2d 559, 561 (1971).

We are convinced from a review of the record that the trial court did not abuse its discretion by declaring a mistrial and by refusing to give the modified *Allen* charge.

The judgment of dismissal is reversed and the cause is remanded for a new trial in accordance with this opinion.

DUBOFSKY, J., specially concurs.

LOHR and KIRSHBAUM, JJ., join in the special concurrence.

DUBOFSKY, Justice, specially concurring:

I specially concur.

Although I agree with the result reached by the majority in Part II, I do not believe that it is necessary to rewrite the child abuse statute to uphold it as constitutional in this case.

I think it is reasonable for the General Assembly to have determined that a person who knowingly places a child in a situation that endangers a child's life or health commits a more reprehensible act than does a person who knowingly places a child in a situation that may endanger a child's life or health. The gravamen of the offense is the person's knowing placement of the child in a dangerous situation. The degree of danger in the situation, rather than the resulting harm to the child, governs the severity of the sanction which may be imposed.

The majority opinion, which directly links conduct which endangers or may endanger a child, with the result—injury or death—writes the language "placed in a situation" out of the statute. So construed, the child abuse statute is indistinguishable from statutes proscribing murder or assault. In this case, the district court ruled unconstitutional sections 18–6–401(1)(a) and (1)(b), C.R.S. only with respect to the mental state "knowingly." Although the majority addresses equal protection problems with the statute which may arise if the conduct charged is reckless or committed through criminal negligence, I am not persuaded that we should rewrite the statute to avoid problems not before us. The sections applied when a person acts "knowingly" may be upheld as constitutional when compared to each other under a simpler analysis.

As the majority notes, in *People v. Hoehl*, 193 Colo. 557, 560, 568 P.2d 484, 486 (1977), we defined the phrase "may endanger" in the context of the child abuse statute then in effect,[1] to mean that "there is a reasonable probability that the child's life or health will be endangered," and stated: "There is no constitutional impediment to the legislature punishing conduct creating less than imminent danger." *Id.* Section 18–6–401(1)(b), then, covers conduct which creates less than imminent danger as well as conduct creating imminent danger. Section 18–6–401(1)(a), on the other hand, applies only to conduct which creates an imminent danger to a child's health. While the sections overlap, in that conduct punishable under the "endangers" standard may also be reached by the "may endanger" standard, they are not identical (conduct creating only a reasonable probability of harm may be reached under section 18–6–401(1)(b), but not section 18–6–401(1)(a)).

In *People v. Velasquez*, 666 P.2d 567 (Colo.1983), we considered an equal protection challenge to a statute prescribing a greater penalty for possession of hashish than for possession of marihuana. We stated:

To be sure, hashish, which is made from the resin of the marihuana plant, satisfies both the statutory definition of marihuana in section 12–22–303(17), C.R.S. 1973 (1982 Supp.) and the statutory definition of marihuana concentrate in section 12–22–303(18), C.R.S.1973 (1982 Supp.). *Because hashish is marihuana, however, does not mean that all marihuana is hashish.*

*Id.* at 569 (emphasis added). We held that there was a rational basis for distinguishing between possession of hashish and marihuana, despite the overlapping definitions. In the case before us, because "endangers" and "may endanger" do not mean the same thing although there is some overlap in the definition, section 18–6–401(1)(a) and section 18–6–401(1)(b) do not proscribe the same conduct.

---

**1.** Section 18–6–401(1)(a), C.R.S.1973, Colo.Sess. Laws 1971, ch. 121 at 448–49.

I am authorized to say that Justice LOHR and Justice KIRSHBAUM join me in this special concurrence.