**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Jordan LEHMKUHL, Defendant– Appellant.**

No. 02CA0149.

Colorado Court of Appeals, Div. I.

Dec. 30, 2004.

Rehearing Denied Jan. 27, 2005.

Certiorari Denied Aug. 8, 2005.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S. 2004.

Ken Salazar, Attorney General, Matthew S. Holman, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Ellen K. Eggleston, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

ROY, J.

Defendant, Jordan Lehmkuhl, appeals the judgment of conviction and sentence imposed following a jury trial. He was convicted of two counts of first degree burglary, two counts of sexual assault, second degree kidnapping, first degree aggravated motor vehicle theft, and three counts of menacing. We affirm.

One evening, three high school girls (D.K., H.M., and T.N.) were alone at the home of D.K.'s grandmother. Defendant, then seventeen years old, appeared with a gun and wearing a mask. He told the girls to keep their heads down, duct-taped their hands behind their backs, put a blanket over their heads, and rummaged around the house.

When asked whether there were any valuables, H.M. indicated that she had a car. Defendant then led H.M. out of the house and placed her in the trunk of her car. After driving for some distance, defendant stopped, let H.M. out of the trunk, disrobed her, and sexually assaulted her in the backseat of her car. After the assault, defendant drove H.M. a short distance, removed her from the car, partially cut the duct tape on her wrists, left her clothes in a pile on the ground, and drove off. H.M. dressed and walked to a nearby house from which the authorities were notified.

One week later, sheriff deputies went to defendant's home to follow up on a shoe print found outside the grandmother's house. Deputies spoke to defendant's mother, and she consented to a search of her home. The deputies obtained from defendant the keys to a locked shed on the premises which they searched and from which they seized shoes, a coat, a role of duct tape, a ski mask, and a pistol. Defendant was taken into custody, advised of his rights, and transported to the sheriff's office.

At the sheriff's office, defendant and his parents were advised of and waived his rights. Defendant was then interrogated in the presence of both his parents. After the interrogation, the deputies discussed with defendant and his parents the possibility that blood, saliva, and hair samples might eliminate defendant as a suspect. Defendant and both parents agreed to the testing. Shortly thereafter, defendant was transported to the hospital by a deputy sheriff for the collection of the samples. The parents did not go to the hospital.

Defendant was charged as an adult. Following a jury trial, defendant was convicted of nine felony counts and was sentenced to two concurrent fifteen-year prison terms plus five years of mandatory parole for the burglary convictions, consecutive terms of thirty years to life plus twenty years to life mandatory parole for sexual assault (merged convictions), twenty-four years plus five years mandatory parole for second degree kidnapping, two years plus three years mandatory parole for motor vehicle theft, five years plus two years mandatory parole for one count of menacing, and two three-year terms plus two years mandatory parole each for the other two menacing convictions, for a cumulative sentence of 103 years to life. This appeal followed.

I.

Defendant contends that because his consent was invalid, the trial court erred in failing to grant his motion to suppress the results of blood, saliva and hair samples taken from him. We disagree.

In ruling on a motion to suppress evidence, the trial court must make findings of fact, and those findings will not be disturbed if adequately supported by competent evidence in the record. We review de novo the application of legal standards to those facts. *People v. Howard*, 92 P.3d 445 (Colo. 2004).

The United States and Colorado Constitutions protect individuals from unreasonable search and seizure of their homes or property. *See* U.S. Const. amend. IV;

Colo. Const. art. II, § 7. This constitutional protection extends to nontestimonial identification evidence such as blood, hair, and saliva samples taken from a defendant for forensic testing. *See Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *People v. Diaz*, 53 P.3d 1171 (Colo. 2002).

■ A warrantless search and seizure is presumptively invalid unless justified by one of the established exceptions to the warrant requirement. *People v. Allison*, 86 P.3d 421 (Colo.2004). A voluntary consent to the search is one of those exceptions. *Petersen v. People*, 939 P.2d 824 (Colo.1997).

■ Voluntariness requires a free and unconstrained choice and consent that is not the result of duress, coercion, or any other form of undue influence. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntariness is a question of fact for the trial court to be established by clear and convincing evidence, and the trial court's findings are reviewed under a clear error standard. *People v. Drake*, 785 P.2d 1257 (Colo.1990). In determining the validity of a consent, the trial court must look at the totality of the surrounding circumstances, including the age, education, state of mind, and intelligence of the person consenting to the search, as well as the duration and location of the search. *People v. Cleburn*, 782 P.2d 784 (Colo.1989).

■ The Colorado Children's Code provides additional protections for a juvenile. A custodial interrogation requires the presence of a parent, guardian, or other legal or physical custodian unless the juvenile and the responsible adult have both expressly waived the requirement. Section 19–2–511, C.R.S. 2004; *People v. Knapp*, 180 Colo. 280, 505 P.2d 7 (1973). The statute thus provides a juvenile with parental guidance during a custodial interrogation to ensure that any waiver of a juvenile's constitutional rights will be made knowingly and intelligently. *People v. Blankenship*, 30 P.3d 698 (Colo.App.2000). Furthermore, under § 19–2–511(5), C.R.S. 2004, a juvenile may speak freely with authorities in the absence of his parents or a responsible adult as long as a statutory written waiver is in place prior to any interrogation. *See Grant v. People*, 48 P.3d 543 (Colo. 2002). This statute codified *Miranda* warnings in the juvenile context. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *People v. Blankenship*, *supra*.

■ Although the statute expressly covers a juvenile's statements while in custody, the supreme court has also applied the parental presence requirement when a juvenile in custody waives his Fourth Amendment rights. Specifically, a parent or responsible adult must be present to consent freely and intelligently to a valid search. *People in Interest of S.J.*, 778 P.2d 1384 (Colo.1989); *People v. Reyes*, 174 Colo. 377, 483 P.2d 1342 (1971).

Here, while the defendant was in custody, he and his mother twice consented to the search and seizure of his blood, saliva, and hair samples. While still at defendant's home, the deputies discussed with defendant's mother, in his presence, the possibility of doing some forensic testing. Defendant spontaneously interjected that he did not commit the crimes and wanted to take a blood test to prove it. Thereafter, defendant was transported to the sheriff's office.

Defendant was subsequently advised of his rights in the presence of both his mother and father, and both defendant and his parents waived those rights at the sheriff's office. After the waiver, the interrogation consisted solely of defendant stating that he did not commit the crime and that he wanted to take a blood test. After the interrogation, the deputies again raised the possibility of forensic testing to eliminate defendant as a suspect. The deputies explained to defendant's parents the four types of biological samples they wished to take from defendant: blood, saliva, hair from the head, and pubic hair. Both defendant and his parents agreed to the testing. Shortly thereafter, defendant was transported to the hospital for the tests without his parents.

Defendant's parents provided their guidance and advice before, during, and after the interrogation. Their position that they wanted the forensic testing done on their son was consistent throughout. Therefore, there is

record support for the trial court's findings that the consent to the search by defendant and his parents was voluntary and not the result of any coercion.

■ Defendant asks that we extend the protections enumerated in § 19–2–511 to require that a parent or responsible adult be present during the collection of the samples. We decline defendant's request because we cannot see any useful purpose in so extending the statute.

Consequently, the trial court did not err when it denied defendant's motion to suppress.

## II.

Defendant contends that the trial court erred in qualifying the prosecution's deoxyribonucleic acid (DNA) expert and that this error violated his right to a fair trial. We disagree.

CRE 702, which governs the admissibility of expert testimony, states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

■ Trial courts are vested with broad discretion in matters of admissibility of expert testimony, and that determination will not be overturned absent an abuse of discretion. *Masters v. People*, 58 P.3d 979 (Colo. 2002).

■ A trial court's inquiry should focus on the reliability and relevance of the proffered testimony. In so doing, a trial court must consider (1) the reliability of the underlying scientific principles, (2) the qualifications of an expert witness, and (3) the usefulness of the testimony to a jury. The inquiry should be broad and consider the totality of the circumstances in each case. This is a liberal standard, and the court also must exercise its discretion under CRE 403 to avoid unfair prejudice. *See People v. Shreck*, 22 P.3d 68 (Colo.2001). Finally, the trial court must issue specific findings on the

CRE 403 and 702 analyses. *People v. Shreck, supra.*

At the outset, we note that the PCR/STR process used here for analyzing the DNA has been held admissible under CRE 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *People v. Shreck, supra.*

According to the evidence, the expert was employed by the Colorado Bureau of Investigation (CBI) and was subject to guidelines issued by the DNA Advisory Board (DAB), which oversees CBI's participation in a national DNA database system. The DAB sets standards and procedures for forensic laboratories that conduct DNA analysis. As to the qualifications of technicians, these standards provide that:

> [The technician must have] at a minimum a BA/BS degree or its equivalent degree in biology-, chemistry-, or forensic science-related area and must have successfully completed college course work (graduate or undergraduate level) covering the subject areas of biochemistry, genetics and molecular biology (molecular genetics, recombinant DNA technology) *or other subjects which provide a basic understanding of the foundation of forensic DNA analysis,* as well as course work and/or training in statistics and population genetics as it applies to forensic DNA analysis.

DAB Quality Assurance Standard 5.3.1 (emphasis added).

Here, the expert had bachelor of science degrees in chemistry and criminalistics, and he had also completed three semesters of graduate degree work in biochemistry. Relevant coursework included statistics, biochemistry, cell biology, forensic field work, and genetics. His graduate work included a foundation in the chemistry of DNA.

The expert had extensive experience in serology before he began performing DNA analysis. After becoming involved in DNA analysis, he gained additional training and understanding of its methodologies from courses conducted by the Federal Bureau of Investigation, received training on the PCR/STR process, passed internal competency examinations throughout his training in DNA

analysis, attended workshops related to STR interpretation sponsored by the manufacturers of the instruments used in the DNA analysis, underwent proficiency examinations at the CBI every six months, analyzed approximately 450 samples prior to the DNA analysis of defendant, and previously qualified and testified as a DNA expert.

■ The trial court determined that the expert witness had specialized education, experience, and training in DNA testing, specifically in the PCR/STR process. The court gave considerable weight to his practical experience with, and training in, PCR/STR DNA analysis.

Defendant objected to the expert's qualifications because (1) the CBI's laboratory is not accredited; (2) his supervisor was not trained in the PCR/STR process; (3) he had not been published or taught courses in PCR/STR analysis; and (4) he had never taken a blind proficiency test. While any one or more of these attributes might have bolstered the expert's qualifications, no one, or combination, of them is necessary to qualify the expert. These attributes go to the weight to be given his testimony, not its admissibility.

The court's findings of fact were sufficient to support its ruling, and the trial court did not abuse its discretion in permitting the testimony of the expert witness.

### III.

Defendant next contends that the trial court erred in denying his motion for mistrial when the DNA expert testified in violation of an order in limine limiting that testimony. We are not persuaded.

■ A mistrial is a drastic remedy, and a trial court's ruling on a motion for mistrial will not be disturbed on appeal absent a gross abuse of discretion. *People v. Haymaker,* 716 P.2d 110 (Colo.1986). A mistrial is warranted only if the prejudice to the defendant is so substantial that it cannot be remedied by other means. *People v. Abbott,* 690 P.2d 1263 (Colo.1984).

Here, the order granting defendant's motion in limine provided that the expert wit-ness could not be asked or testify about additional samples of DNA material preserved and available for independent testing by the defense because such testimony was unfairly prejudicial under CRE 403.

During defendant's cross-examination of the expert, the following colloquy occurred:

DEFENSE COUNSEL: And you're indicating to this jury that there is—the potential for false positive results due to laboratory error [that] is not recognized within the forensic community?

WITNESS: The potential for it is recognized. And the way that one can best deal with the concern or question with regards to a false positive result is to retest the sample. And we at the Colorado Bureau of Investigation make both the evidence available for retesting, as well as the extracted DNA that we utilize in our testing [if it] is of sufficient quantity so it can be retested. And that is the best way to determine whether or not there is a false positive associated with the given test. And that's what the standard response is of the forensic science community as it regards DNA testing.

At this point, defense counsel moved for a mistrial, arguing the testimony was unresponsive and added statements about retesting previously deemed inadmissible by court order. Defense counsel argued that these statements shifted the burden of proof and were highly prejudicial.

Although the witness could have answered the question with a simple "yes" or "no," and the witness's answer approached, if not entered, an area the court had prohibited, the trial court denied defendant's motion for a mistrial. Instead, the trial court struck the response and instructed the jury to disregard the answer. The trial court observed that there is a presumption the jury will follow the court's instruction and that, based on the descriptions of the slicing process itself, there was sufficient evidence from which the jury could have inferred that samples were available for retesting.

■ The trial court relied on the standards for a mistrial established in *People v. Schwartz,* 678 P.2d 1000 (Colo.1984), and

*People v. Fincham,* 799 P.2d 419 (Colo.App. 1990), and concluded that they were not present here and that a limiting instruction would remedy the error. In *Schwartz,* the court stated that the purpose of the manifest necessity test, used in determining when mistrial is proper, is to protect a defendant against bad faith conduct of a prosecutor or judge and should be invoked where a mistrial would afford the prosecution a more favorable opportunity to convict the defendant. *People v. Schwartz, supra,* 678 P.2d at 1011. Moreover, in *Fincham,* a division of this court concluded that no mistrial was required where an advisory witness impermissibly testified about finding sexual paraphernalia and magazines in a defendant's bedroom. In so concluding, the division stated that the witness's violation of the court order was not aggravated or intentional, and the trial court offered a cautionary instruction to the jury. *People v. Fincham, supra,* 799 P.2d at 423. Here, we perceive no error by the trial court because any prejudice suffered by defendant was curable by the striking of the answer and the curative instruction.

■ We also reject defendant's contention that the testimony impermissibly shifted the burden of proof to him. Defendant relies upon *Hayes v. State,* 660 So.2d 257 (Fla. 1995), for the proposition that statements about retesting may mislead the jury to believe that a defendant has an obligation to test evidence for exculpatory purposes. In *Hayes,* the prosecution asked the expert witness on redirect examination whether the defense had requested any testing of the blood evidence from a murder scene. In addition, the prosecution alluded to the defendant's failure to retest hairs found at the crime scene. Unlike in *Hayes,* however, here the witness's statement made no mention of defendant or of any obligation of defendant to retest the DNA samples. Nor did the prosecution make any such suggestion. Thus, Hayes is distinguishable.

Further, the witness was responding to cross-examination concerning how the possibility of false positive results is addressed. Nothing in the witness's testimony shows he acted intentionally in bringing up retesting. The witness did not say that the samples are retained for use by the defense or that the defense bears any responsibility to conduct independent tests. Thus, this case is similar to *Fincham,* where the trial court offered an instruction to remedy the error.

Consequently, we conclude that the trial court did not err in denying defendant's motion for mistrial.

## IV.

Defendant next contends that the instruction on deadly weapon sexual assault, as interpreted in isolation from the other two instructions, is erroneous because it did not include as a separate element that submission occurred because of the actual application of physical force or violence, or that defendant used means reasonably calculated to cause submission of the victim's will. In essence, defendant argues that the jury was not informed as to how the victim was made to submit. We conclude there was no instructional error.

Defendant was charged with three counts of sexual assault based upon the single sexual contact he had with the victim. The charges included one count of "sufficient consequences" sexual assault, § 18–3–402(1)(a), C.R.S.2004, a class four felony; one count of force and violence sexual assault, § 18–3–402(4)(a), C.R.S.2004, a class three felony; and one count of deadly weapon sexual assault, § 18–3–402(5)(a), C.R.S.2004, a class two felony.

The pertinent elemental instructions, to which defendant did not object, read as follows:

The elements of the crime of [sufficient consequences] sexual assault . . . are:

1. That the defendant,

2. In the State of Colorado, at or about the date and place charged,

3. Knowingly,

4. Inflicted sexual intrusion or sexual penetration on a person, and

5. Caused submission of that person,

6. By means of sufficient consequence reasonably calculated to cause submission against that person's will.

The elements of the crime of [force and violence] sexual assault . . . are:

1. That the defendant,

2. In the State of Colorado, at or about the date and place charged,

3. Knowingly,

4. Inflicted sexual intrusion or sexual penetration on a person, and

5. Caused submission of that person,

6. Through the actual application of physical force or physical violence.

The elements of the crime of [deadly weapon] sexual assault . . . are:

1. That the defendant,

2. In the State of Colorado, at or about the date and place charged,

3. Knowingly,

4. Inflicted sexual intrusion or sexual penetration on a person, and

5. The defendant was armed with a deadly weapon, and

6. Used a deadly weapon to cause submission of that person.

The sexual assault statute, § 18–3–402, establishes different methods by which submission of the victim is obtained. The class of felony, and therefore the penalty, differ depending on the method used. The use of a deadly weapon is sufficient unto itself and is the most serious.

▮▮▮ Contrary to defendant's argument, when the jury is instructed as to deadly weapon sexual assault, the jury need not determine whether, or be instructed that, submission was obtained by "the actual application of physical force or physical violence," or by the application of "means of sufficient consequence reasonably calculated to cause submission," or both, *and* that a deadly weapon was used. If a deadly weapon was used to cause submission, that is sufficient.

Therefore, there was no error in the instructions.

## V.

Defendant next contends that the trial court erred by imposing consecutive sentences based upon its findings that the crimes were part of a single episode. We do not agree.

▮▮▮ Sentencing is committed to the discretion of the trial court, and absent a manifestly arbitrary, unreasonable, or unfair sentence, we will not overturn it on review. *People v. Fuller*, 791 P.2d 702 (Colo.1990); *People v. Harding*, 17 P.3d 183 (Colo.App. 2000). On review, we must determine whether the sentence is consistent with the nature of the offense, the character of defendant, and the public's interest in safety and deterrence. *People v. Vigil*, 718 P.2d 496 (Colo.1986).

Section 18–1.3–406(1)(a), C.R.S.2004, provides that in the event the defendant is convicted of two or more crimes of violence arising from the same incident, the sentences shall be served consecutively and shall be "for a term of incarceration of at least the midpoint in, but not more than twice the maximum of, the presumptive range provided for such offense." Section 18–1.3–1004(1)(a), C.R.S.2004, requires the trial court to sentence a sex offender for an "indeterminate term of at least the minimum of the presumptive range specified in section 18–1.3–401 for the level of offense committed and a maximum of the sex offender's natural life."

The presumptive range for a class two felony is eight to twenty-four years. Section 18–1.3–401(1)(a)(V)(A), C.R.S.2004. Section 18–1.3–1004(5), C.R.S.2004, requires that a sex offender be sentenced in accordance with § 18–1.3–401(1), and if the sex offender was convicted of other crimes arising out of the same incident, then he or she shall serve the sentences consecutively rather than concurrently.

Here, the trial court vacated defendant's conviction of sufficient consequences sexual assault, a class four felony, and merged it with deadly weapon sexual assault, a class two felony. Because deadly weapon sexual assault is both a sex offense and a crime of violence, the court was required to sentence defendant to an indeterminate sentence with a minimum of sixteen years (midpoint in presumptive range for a class two felony) to a maximum of defendant's natural life. The court, after weighing mitigating and aggravating factors, imposed a sentence of thirty

years to life for the deadly weapon sexual assault.

Defendant objects that this sentence was imposed to run consecutively to all the other sentences (except the two concurrent burglary convictions). He asserts that the trial court, not the jury, impermissibly made the determination that the events of the night in question were the result of a single criminal episode. We disagree.

Defendant relies on the Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 2362–63, 147 L.Ed.2d 435 (2000), that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." More recently, the Court applied the *Apprendi* statutory maximum rule to a Washington state sentencing scheme and reiterated that a trial court's sentencing authority is limited to facts based upon the jury verdict or the defendant's own admissions. *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Taken together, *Apprendi* and *Blakely* limit sentencing up to the statutory maximum in the presumptive range for a particular class of felony, unless a defendant admits certain facts or other applicable statutes increase the range of the sentence. *People v. Solis–Martinez*, — P.3d —, 2004 WL 2002525 (Colo.App. 03CA1365, Sept. 9, 2004).

 Here, however, the sentencing court was required to abide by the sentencing statutes that increased defendant's sentence, and because the sentence is within the statutory maximum, *Apprendi* and *Blakely* are not implicated.

The trial court may engage in fact finding in its imposition of consecutive sentences pursuant to § 18–1.3–406(1)(a), the crime of violence statute. *See People v. Clifton*, 69 P.3d 81 (Colo.App.2001), *reaff'd in part*, 74 P.3d 519 (Colo.App.2003). In *Clifton*, the defendant was sentenced consecutively for two counts of aggravated robbery arising out of the robbery of a video rental store. During the robbery, he and an accomplice forced two employees into a back office, held them at gunpoint, and then forced one employee to remain on the floor while the other employee was ordered to open a safe and turn over the store's money. There, as here, the defendant argued that the consecutive sentences were unconstitutional under *Apprendi* because the trial judge, not the jury, found that the two counts arose out of the same incident. The division rejected the argument and stated:

> *Apprendi* does not prohibit all fact finding by the trial court. It only proscribes fact finding by the trial court that increases the penalty for a crime beyond the prescribed statutory maximum. As was explained in *United States v. White*, [240 F.3d 127, 136 (2d Cir.2001) ], where factual determinations are "used to sentence the defendant to a sentence within the maximum allowed by statute, *Apprendi* is not controlling, and such determinations can be made by the court without violating the defendant's right to due process." .... In Colorado, consecutive sentences are not considered to be a single sentence. Each sentence is to be served separately.
>
> When defendant's sentence on each count is viewed separately, each sentence he received was less than the statutory maximum prescribed for the offense. Thus, while we fully acknowledge the practical impact of the consecutive sentences upon defendant, we nevertheless conclude the imposition of consecutive sentences did not increase his sentence for each offense.
>
> In summary, we conclude the imposition of consecutive sentences under § 16–11–309(1)(a) [now recodified as 18–1.3–406(1)(a) ] did not have the effect of increasing the penalty for the underlying crimes beyond the maximum provided for each offense, and therefore the statute does not violate the Supreme Court's holding in *Apprendi*.

*People v. Clifton, supra*, 69 P.3d at 85–86 (citations omitted).

We are persuaded by the rationale and holding of *People v. Clifton*.

Here, the court found that the events were the result of a single criminal episode which began at the house with defendant's menacing the three girls, binding them with duct

tape, and threatening them. The court described the kidnapping as "the next step in this criminal episode," during which defendant removed the bound and hooded victim from the house at gun point, placed her in the trunk of her car, brought her to an isolated area, and sexually assaulted her.

We conclude that the trial court engaged in permissible fact finding when it determined that the crimes were the result of a single criminal episode, and did not abuse its discretion when it applied § 18–1.3–1004(5) and sentenced defendant to consecutive sentences.

## VI.

Defendant's final contention is that the Colorado Sex Offender Lifetime Supervision Act of 1998, § 18–1.3–1001, et seq., C.R.S.2004 (the Act), is facially unconstitutional. We do not agree.

At the sentencing hearing, defendant argued for a determinate sentence on the grounds that the Act violates procedural and substantive due process, equal protection, the separation of powers, the privilege against self-incrimination, and the constitutional proscription against cruel and unusual punishment.

In *People v. Oglethorpe*, 87 P.3d 129 (Colo. App.2003), a division of this court rejected these same arguments. We conclude that the rationale of *Oglethorpe* applies and is dispositive of defendant's contentions as to due process, equal protection, separation of powers, and cruel and unusual punishment

protections. *See also People v. Strean*, 74 P.3d 387 (Colo.App.2002).

Defendant asserts that because the Act requires sex offenders to demonstrate therapeutic progress before being considered for parole and such progress requires that he admit his misconduct, it impinges on his privilege against self-incrimination. The *Oglethorpe* division also addressed this argument, but unlike defendant here, the *Oglethorpe* defendant pleaded guilty and admitted to committing the offense. However, *McKune v. Lile*, 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002)(plurality opinion), in which the defendant was convicted following a jury trial, is applicable to the facts here. In *McKune*, the Supreme Court held that a sex offender program that required participants to make certain admissions as to past sex offenses did not infringe on the privilege against self-incrimination. We are persuaded by the holding and rationale of *McKune* and conclude that the Act is not facially unconstitutional.

The judgment and sentence are affirmed.

Judge MARQUEZ and Judge CASEBOLT concur.