Opinion by JUDGE DAILEY
¶ 1 Defendant, Dherl Jefferson, appeals the judgment of conviction entered on jury verdicts finding him guilty of sexual assault on a child and sexual assault on a child by one in position of trust. We reverse and remand for a new trial.
I. Background
¶ 2 Defendant was a friend of L.T., a mother of two small children. In 2008 and 2009, he watched the children without their mother being present four times, including two overnights. On one of the overnights, he allegedly picked up five-year-old J.B., brought her to his bedroom, laid her on the bed, pulled down her underwear, and touched her vaginal area.
¶ 3 This allegation surfaced after L.T. (the mother) had been lecturing the children about lying and the consequences of lying, one of which would be that they would not be believed if something bad happened to them. When the mother followed up by asking whether anything bad had happened to them, J.B. responded by saying that "Uncle Dherl" had touched her "booty," showing the mother, however, that he had touched her vaginal area. According to the mother, J.B. said it happened "every time we go over there."
¶ 4 After the mother reported the incident to the police, J.B. was subjected to a medical examination, which revealed no visible injuries, and to a forensic interview, which was videotaped. During the interview, J.B. stated that, besides pulling down her underwear and rubbing her bottom with his hand,[1] defendant also got on top of her, moved up and down, and did "sex stuff" or "stuff like sex." At one point, she said defendant "humped" her.
¶ 5At trial, the prosecution presented:
• J.B.'s out-of-court statements to her mother, to J.B.'s brother (J.V.B.), to an investigator for the district attorney's office, and (via testimony and videotape) to the forensic interviewer;
*825 • testimony from the by-then seven-year-old J.B., after she had watched, outside of court, the video of her prior interview;
• testimony from J.V.B., who related that, although he and J.B. normally shared the couch when sleeping over at defendant's house, he woke up one night and observed that J.B. was in defendant's bedroom; and,
• testimony from a licensed clinical social worker regarding typical behavior of child sexual assault victims.
¶ 6 Defendant did not testify. He argued, however, that J.B. was not credible and that the mother and the forensic interviewer had suggested the allegations of abuse to J.B. He introduced evidence that the mother had broken into his apartment and stolen some of his property while he was incarcerated. He also pointed to inconsistencies among the statements J.B. had made to her mother, J.B.'s live testimony, and her video-recorded statements to the forensic interviewer. And he suggested that J.B.'s allegation that defendant had "humped" her was unbelievable because J.V.B., who was in the next room, had not heard it happening.
¶ 7 The jury found defendant guilty of the above-mentioned charges, and the trial court sentenced him to an aggregate term of ten years to life imprisonment in the custody of the Department of Corrections.
II. Jury Access to Videotaped Interview of J.B.
¶ 8 Defendant contends that the trial court abused its discretion when it gave the jury unrestricted and unsupervised access during deliberations to the videotaped forensic interview of J.B. We agree.
A. Abuse of Discretion
¶ 9 The trial court admitted the videotaped interview as child hearsay under section 13-25-129, C.R.S.2013. Defendant objected not to the admission of the videotaped interview as evidence, but to any possession of it by the jury that would allow it to be given undue emphasis by being played "over and over and over." Ultimately, the court exercised its discretion to permit the jury to have unrestricted access to the videotaped interview during deliberations. It reached its decision by reasoning that:
First of all, the Court can consider whether or not the videotape was admitted as an exhibit and played for the jury in open court during the trial, thus reducing the likelihood that the jury would place undue weight on it. In this case that was true. The DVD was played for the jury. [It] had the opportunity to see it. And so in that case that factor weighs in favor of allowing the jury to have in [its] possession and view it as [it] wish[es].
The second is whether inculpatory evidence was introduced at trial in addition to the videotape. In this case it includes the victim who is JB.... [S]he has testified in this case incriminating the defendant and made clear statements about that. There were also other hearsay witnesses to statements that the ... victim made during her outcry. Those being to her mother, her brother and the forensic interviewer whose [sic] is depicted in the DVD, all of whom were present at trial, testified at trial, subject to cross-examination.
And lastly, the court can consider the issue of whether the jury was allowed to take notes which would preserve trial testimony in note form. And therefore, the prospect of [sic] the jury would place greater evidence [sic] on that preserved trial testimony militates, again, in favor of allowing the jury to take the DVD with [it] into the jury room unsupervised.
¶ 10 Generally, a jury is permitted to take into the jury room all exhibits received into evidence, subject to the trial court's discretion to order otherwise. See Frasco v. People, 165 P.3d 701, 703 (Colo.2007). The trial court has an obligation, however, to ensure that " 'evidence is not so selected, nor used in such a manner, that there is a likelihood of it being given undue weight or emphasis by the jury.' " Id . (quoting Settle v. People, 180 Colo. 262, 264, 504 P.2d 680, 680-81 (1972) ). This obligation is particularly pronounced with respect to jury access during deliberations to portions of trial testimony (as in Settle ) and to exhibits substituting for trial testimony. See *826 Frasco, 165 P.3d at 704 (noting "a general recognition that granting jury access to exhibits substituting for trial testimony necessarily shares the same risk of 'undue weight or emphasis' about which we expressed concern in the context of trial testimony itself" (citation omitted)).
¶ 11 Thus, a trial court must "oversee with caution" the jury's use of exhibits of a testimonial character, including video recorded interviews of witnesses. See id . at 703-04 (citing People v. Montoya, 773 P.2d 623, 626 (Colo.App.1989) ); see also People v. DeBella, 219 P.3d 390, 402 n. 1 (Colo.App.2009) ( DeBella I ) (Dailey, J., dissenting) ("Testimonial exhibits are transcripts of testimony or exhibits substituting for trial testimony."), rev'd, 233 P.3d 664 (Colo.2010) ( DeBella II ).[2]
¶ 12 The trial court must exercise its discretion to permit, deny, or limit the jury's use of a testimonial exhibit by assessing (1) whether the exhibit will aid the jury in its proper consideration of the case, and, even if it would, (2) whether a party will nevertheless be unfairly prejudiced by the jury's use of the exhibit. Frasco, 165 P.3d at 704-05. Ultimately, the court "has an obligation ... to assure that juries are not permitted to use exhibits in a manner that is unfairly prejudicial to a party." Id. at 704.
¶ 13 We apply the abuse of discretion standard to a trial court's refusal to exclude or limit the jury's use of an exhibit during deliberations. DeBella II, 233 P.3d at 666-67. In this regard, "[a]n appellate court may not assign error to a trial court merely because it would have reached a different conclusion." Id . at 667. "Rather, ... a court's refusal to exclude or otherwise limit the use of an exhibit will generally be overturned only when it is manifestly arbitrary, unreasonable, or unfair," id. or it is based on an erroneous understanding or application of the law. See People v. Esparza-Treto, 282 P.3d 471, 480 (Colo.App.2011) (discussing abuse of discretion standard of review, in general).
¶ 14 In Frasco, the supreme court held that the trial court did not abuse its discretion in giving a videotaped statement of the child sex assault victim to the jury. 165 P.3d at 705-06. Specifically, the court perceived an absence of unfair prejudice in the record, where (1) the trial court initially did not allow the jury to take the videotape into the jury room; (2) when the jury asked to view the exhibit, defense counsel did not object or request a limiting procedure or instruction; (3) the court, nonetheless, instructed the jury not to give the videotape any special weight; and (4) the defendant alleged nothing about the particulars of the videotape that would likely have rendered the jury's review unfairly prejudicial. See id.
¶ 15 In DeBella II, the supreme court again considered the propriety of a jury having unfettered access to videotaped interviews of a child sexual assault victim. There, the court reiterated the principles set forth in Frasco and explained that a trial court's failure to exercise its discretion because of an erroneous construction of controlling authority is tantamount to an abuse of discretion. 233 P.3d at 666-67. Applying these principles to the case before it, in which the trial court had relied on subsequently disapproved case law to allow the jury unimpeded access to the videotapes at issue, the supreme court concluded that the trial court's failure to exercise its discretion constituted an abuse of discretion. Id . at 668.
¶ 16 In the present case, the trial court affirmatively exercised its discretion to provide no control over the jury's access to the video. In reaching its decision, it relied upon factors which the majority of the division in DeBella I had utilized to sustain similar action by the trial court in that case. The pertinence of those factors, however, is, at best, unclear, in light of (1) DeBella II 's reversal of the majority's decision in DeBella I and (2) the well-established law that a correct judgment may be upheld on any ground supported by the record. See People v. Holmes, 959 P.2d 406, 409 (Colo.1998) ; People v. Quintana, 882 P.2d 1366, 1371 (Colo.1994). In our view, the trial court erred in relying on those factors.
*827 ¶ 17 We begin with the recognition that "the nature of videotaped testimony increases the likelihood it will be given undue emphasis when replayed" during jury deliberations. State v. Koontz, 145 Wash.2d 650, 41 P.3d 475, 479 (2002).
In essence, the witness is brought before the jury a second time, after completion of the defense case, to repeat exactly what was testified to in the State's case. The witness' words and all of the animation, passion, or sympathy originally conveyed are again presented to the jury. It is difficult to deny that there is an advantage that may be gained in such circumstances.
State v. Michaels, 264 N.J.Super. 579, 625 A.2d 489, 524 (App.Div.1993), aff'd , 136 N.J. 299, 642 A.2d 1372 (1994), and quoted with approval in State v. Burr , 195 N.J. 119, 948 A.2d 627, 635-36 (2008) (recognizing that "allowing a jury unfettered access to videotaped witness statements could have much the same prejudicial effect as allowing a jury unrestricted access to videotaped testimony during deliberations"); see United States v. Binder, 769 F.2d 595, 600 (9th Cir.1985) ("Videotape testimony is unique. It enables the jury to observe the demeanor and to hear the testimony of the witness. It serves as the functional equivalent of a live witness [with the jury in the room]."), overruled on other grounds by United States v. Morales, 108 F.3d 1031, 1035 n. 1 (9th Cir.1997) (en banc); Young v. State, 645 So.2d 965, 967 (Fla.1994) ("By permitting the jurors to see the interview once again in the jury room, there is a real danger that the child's statements will be unfairly given more emphasis than other testimony. Furthermore, unlike testimony in open court or even deposition testimony, the interviews are conducted on an ex parte basis without the right of cross-examination."); Martin v. State, 747 P.2d 316, 319 (Okla.Crim.App.1987) ("[T]here is an important distinction between having parts of testimony dispassionately read to a jury and allowing the jury to hear, and see, the entire testimony of an empathetic witness, such as a child describing a painful experience in his young life. The possibility for abuse is, we believe, substantially increased with video technology. This being so, a trial judge should carefully consider the alternatives before placing the video in the unrestrained hands of the jury during deliberation. We believe that the risk of prejudice is great in this situation.").
¶ 18 The heightened danger that undue emphasis will be placed on detailed videotaped statements of victim-witnesses is exacerbated in cases like the present one, where minimal evidence corroborates the victim's statements and testimony. In this type of situation, the trial court should exercise some form of control over the jury's access to, or consideration of, the victim's videotaped statements.
¶ 19 Mechanisms for controlling the jury's consideration of videotaped statements may include (1) replaying the videotape for the jury, in open court, under the supervision of court personnel; (2) instructing the jury to watch the videotape in deliberations no more than a specific number of times; or (3) instructing the jury not to give any special weight to the videotape. See DeBella II, 233 P.3d at 669.
¶ 20 Here, unlike the trial court, we are not persuaded that any concern for unfair prejudice was alleviated simply because the videotape was first played for the jury in open court. Whether a jury will give undue weight to, or place undue emphasis on, a testimonial exhibit cannot be determined by whether the exhibit was admissible (or admitted) in the first place. To the contrary, the jury's ability to access (and particularly, to have unrestricted and unsupervised access to) an exhibit after it has been admitted and used before the jury in open court creates the danger of its being given undue weight or emphasis, within the meaning of Frasco and DeBella II .
¶ 21 Nor are we persuaded that the danger of a jury's giving undue weight or emphasis to a testimonial exhibit during deliberations is, in reality, little different from the danger that the jury would place emphasis on trial testimony as preserved in the notes of individual jurors. Unlike a videotaped exhibit, juror notes are not evidence, are not superior to independent recollections of the jurors, and do not prevail over the evidence presented *828 at trial.[3] In contrast, the videotaped exhibit is evidence; it is not subject to correction by an individual juror's recollection, and, is, as we explained earlier, the equivalent of allowing a witness (not, as in the case of a juror, an impartial decision maker) into the jury room.
¶ 22 Further, a juror's note cannot replicate the animation, passion, or vulnerability of the witness whose statements are captured on a videotaped exhibit.
¶ 23 Because two of the grounds identified by the trial court were insufficient to support a reasonable conclusion that the trial court need not control the jury's access to J.B.'s videotaped statements, we conclude that the trial court abused its discretion in allowing the jury unfettered access to the statements during deliberations.
¶ 24 In reaching this conclusion, we recognize that the trial court relied upon a third reason for not restricting the jury's access to the statements-that is, that there was other evidence (J.B.'s testimony and hearsay statements to others) incriminating defendant. In our view, that factor is relevant not to determining whether juror access to videotaped statements should be restricted, but, rather, to whether any error in refusing to restrict such access was harmless or reversible.
B. Prejudice
¶ 25 Not all abuses of discretion warrant reversal. DeBella II, 233 P.3d at 667. Where the issues are properly preserved for appellate review, only those erroneous rulings that substantially influenced the verdict or affected the fairness of the trial require reversal. Id. If the influence of the error on the trial is apparent, or if one is left "in grave doubt" as to its effect on the verdict or the fairness of the trial proceedings, the conviction cannot stand. Id.
¶ 26 Here, we are left with such a grave doubt.
¶ 27 To be sure, the videotaped interview was not the only inculpatory evidence introduced at trial. The mother, J.V.B., an investigator for the district attorney, and a forensic interviewer each testified regarding J.B.'s descriptions of the sexual contact between her and defendant. And J.V.B. testified that he discovered that J.B. was in defendant's bedroom during one of the overnight visits.
¶ 28 The videotaped interview, however, was very important prosecution evidence. Other than J.B. and defendant, there were no eyewitnesses to what occurred, and there was no physical evidence corroborating J.B.'s allegations. The videotaped interview was conducted the day after J.B.'s initial disclosure of the allegations to her mother, and it contained J.B.'s detailed account of her sexual contact with defendant. During her live testimony, almost two years after the alleged assaults, J.B. was unable to remember many details about what had happened between her and defendant, including what he had done when he sat on top of her. Accordingly, the prosecutor elicited testimony from J.B. by asking her if she remembered telling the forensic interviewer certain things. And, while J.B. told the interviewer that defendant had sexual contact with her on more than one occasion (she stated that it happened "two or four" times), she was only able to describe one incident in any detail.
¶ 29 Thus, the video served the same kind of gap-filling role as in DeBella II, a case where, like here, the victim's credibility was the main issue at trial. See 233 P.3d at 668-69 (noting that because the videotaped interview of the victim contained a "detailed account of the sexual assaults, including some aspects the victim could not remember at trial," the videotape, "as the only complete recounting of the assaults, ... was the linchpin of the prosecution's case"); see also Montoya, 773 P.2d at 626 (unrestricted jury access to video recording of statements made by a witness to a robbery was prejudicial error because the witness recanted at trial and the video was "the primary, if not the sole, evidence of defendant's guilt"); People v. Talley, 824 P.2d 65, 67 (Colo.App.1991) (allowing jury access to audiotape of pretrial interview with child sex assault victim was reversible error where the audiotape was *829 inconsistent with testimony at trial on "which assault [of two alleged] occurred first"; "what occurred during each incident, ... the dates of the incidents, [and] ... whether a sexual assault had occurred and the source of any penetration").
¶ 30 The importance of the videotaped interview to the prosecution's case is further underscored by the prosecutor's several references to it during closing argument. Indeed, the prosecutor prefaced her description of the jury's task during deliberations by stating:
Now, you saw the video of [J.B.] with [the forensic interviewer]. You heard her say things like, It's the stuff that boys and girls and grownups do. You heard her say, I don't want to say it when she was pushed by [the forensic interviewer] to talk about what [defendant] did to her. He got on top of me and does the sex stuff. And then later that her body felt wiggly when he was on top of her and humping her. When asked by [the forensic interviewer] whether or not she had ever been touched or been asked to touch [defendant]'s body, she immediately said no, I never did that stuff to him.
And it's your job based on that review of the video which you'll have with you in the jury room if you care to review it again and based upon meeting [J.B.] here in the courtroom to decide. Is she telling the truth? Or is she in fact just parroting things that her mother told her to say?
¶ 31 This emphasis on the videotape in closing and the prosecutor's suggestion that the jury review it again indicates a strong likelihood that the jury would have considered it carefully during deliberations.
¶ 32 Further, as in DeBella II, the court gave no limiting instruction regarding the jury's use of the video, thus permitting the jurors to place unlimited weight on the videotape and disregarding the court's "obligation to 'observe caution' that the tape was not used in such a manner as to create a likelihood of it being given undue weight or emphasis by the jury." 233 P.3d at 669 (quoting Settle, 180 Colo. at 264, 504 P.2d at 680-81 ).
¶ 33 Notwithstanding the foregoing, the People assert that defendant did not suffer sufficient prejudice to warrant reversal because (1) the jury heard J.B.'s hearsay statements from the mother, J.V.B., the forensic interviewer, and from J.B. herself, all of whom were subject to cross-examination; (2) the trial court instructed the jury to "determine the weight and credibility to be given" to J.B.'s out-of-court statements; (3) the length of deliberations (approximately four hours) indicated the jury did not repeatedly view the approximately forty-five minute interview; and (4) defense counsel referred to the videotape during closing arguments, pointing out inconsistencies between J.B.'s statements to her mother and those J.B. made in the videotape. We reject each of these arguments.
¶ 34 First, although the prosecution's witnesses recounted J.B.'s hearsay statements and J.B. testified in court, allowing the jury to have unlimited access to the videotaped version of J.B.'s story during deliberations was the "functional equivalent" of having J.B. in the deliberation room with it. See Binder, 769 F.2d at 600.
¶ 35 Second, the instruction directing the jurors to determine the weight of J.B.'s hearsay statements did nothing to prevent them from placing undue emphasis on the videotaped interview because of their unrestricted access to it, as opposed to other testimony in the case.
¶ 36 Third, the length of jury deliberations here does not provide an accurate indication of the events that took place during such deliberations, much less that the prosecution's case was strong independent of the videotape. Cf. R.J.Z. v. People, 104 P.3d 278, 282 (Colo.App.2004) ("[A]ssessing the strength of the government's case based on the length of jury deliberations necessarily involves speculation and does not, without more, establish that the prosecution's case was strong." (citation omitted)).
¶ 37 And, finally, the supreme court has rejected the contention that a defendant's use of a videotape at issue to highlight prior inconsistent statements necessarily undermines a showing of prejudice, particularly when, as here, the defendant had objected to *830 the admission of such evidence and the jury's unfettered access to it. See DeBella II, 233 P.3d at 669 (stating that (1) such an argument "conflate[s] an emphasis on contrasting evidence with a charge that the jury review a specific exhibit" and (2) a "defense attorney's decision to argue evidence admitted over his objection should not operate as a concession to its later use" by the jury). Rather, "the inconsistencies between the victim's recorded and trial accounts of the incidents-almost always present in cases such as these-underscore how central the victim's credibility was to the resolution of the trial, thus heightening the danger of providing the jury with unchaperoned access to only one side of the story." Id.
¶ 38 For these reasons, we conclude that defendant's convictions must be reversed and that the case must be remanded for a new trial.
III. Other Issues Likely to Recur Upon Retrial
¶ 39 For the benefit of the trial court, we provide the following guidance on issues that were raised on appeal by defendant and are likely to recur upon retrial:
• Because the prosecution's expert was a licensed clinical social worker with a master's degree in social work, a professor of trauma intervention, had treated more than 300 child victims of sexual assault, and had testified as an expert in trials in seven different counties, the court did not abuse its discretion in qualifying her, based on her training and experience, as an expert in the area of treating child victims of sexual assault. See CRE 702 (an expert qualified by "knowledge, skill, experience, training or education" may present opinions based on "scientific, technical, or other specialized knowledge" if it will assist the trier of fact); People v. Whitman, 205 P.3d 371, 382 (Colo.App.2007) (noting that a trial court has broad latitude in determining whether a witness is qualified to be an expert witness, and concluding that a therapist who had treated victims of abuse for seventeen years, performed in and attended numerous presentations every year, and testified in court as an expert over twenty-five times was properly qualified).[4]
• Because the prosecution sought only to qualify the expert in the treatment of child sexual assault victims, and not in the behavior of children who have not been sexually assaulted, any lack of knowledge or experience by the expert with children who were not sexually assaulted affected the weight of her testimony rather than its admissibility. See People v. Lehmkuhl, 117 P.3d 98, 104 (Colo.App.2004) (where an expert lacks certain additional knowledge or training within the field in which the expert is qualified to testify, such deficiency "go[es] to the weight to be given his [or her] testimony, not its admissibility").
• Unless defendant were to somehow "open the door," the prosecution's expert should not opine that a forensic interviewer's job is to determine whether or not a child is telling the truth. In a case where, as here, a forensic interviewer is scheduled to testify on behalf of the prosecution about the child's out-of-court statements, the expert's testimony could easily be interpreted by the jury as indirect evidence of the interviewer's opinion that J.B.'s statements were truthful. Cf. CRE 403 (evidence excludable on grounds of confusion of the issues or unfair prejudice); see CRE 608(a) (a witness may not opine with respect to whether another witness was telling the truth on a specific occasion); People v. Wittrein, 221 P.3d 1076, 1081 (Colo.2009) ("[N]either lay nor expert witnesses may give opinion testimony that another witness was telling the truth on a specific occasion.").
IV. Conclusion
¶ 40 The judgment of conviction is reversed and the case is remanded for a new *831 trial conducted in accord with the views expressed in this opinion.
JUDGE CASEBOLT and JUDGE BERGER concur.

She indicated on a drawing that he was actually rubbing her vaginal area.

We do not, in this opinion, address whether the same rule should apply to videotaped statements of a defendant which have been admitted into evidence. See People v. Ferrero, 874 P.2d 468, 472-73 (Colo.App.1993) (rule is inapplicable in that context).

See United States v. Maclean, 578 F.2d 64, 66 (3d Cir.1978) ; People v. Hues, 92 N.Y.2d 413, 681 N.Y.S.2d 779, 704 N.E.2d 546, 549-50 (1998).

Nor did her testimony need to be based on peer-reviewed research. See People v. Shreck, 22 P.3d 68, 75 (Colo.2001) (experience-based specialized knowledge is not dependent on a scientific explanation, so it does not require peer-reviewed research or scientific testing).