24CA1292 Peo in Interest of XH 04-03-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1292
Weld County District Court No. 22JV105
Honorable W. Troy Hause, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of X.H. and R.C.H., Children,

and Concerning J.S. and R.H.,

Appellants.

---

JUDGMENT AFFIRMED

Division II
Opinion by CHIEF JUDGE ROMÁN
Fox and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 3, 2025

---

Bruce T. Barker, County Attorney, David S. Anderson, Assistant County Attorney, Greeley, Colorado, for Appellee

Debra W. Dodd, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant J.S.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant R.H.

¶ 1    In this dependency and neglect proceeding, J.S. (mother) and R.H. (father) appeal the judgment terminating their parent-child legal relationships with X.H. and R.C.H. (the children).  We affirm.

## I.    Background

¶ 2    The Weld County Department of Human Services (Department) received a referral with concerns that mother was using methamphetamine and marijuana and that R.C.H. was born exposed to these substances.  The Department also had concerns that father had a substantial history of methamphetamine use.  A week after R.C.H.'s birth and while X.H. was under two, the Department filed a petition in dependency and neglect.

¶ 3    The juvenile court placed the children in the temporary physical custody of their maternal grandmother.  The court adjudicated the children dependent and neglected and adopted treatment plans for the parents.

¶ 4    The Department moved to terminate the parents' parental rights.  Nearly two years after the petition was filed, the juvenile court held a termination hearing.  The children had resided with maternal grandmother for the duration of the case.  The court

heard testimony from two caseworkers and ultimately terminated mother's and father's parental rights.

¶ 5     Father and mother now appeal.

¶ 6     Father challenges the termination judgment on two grounds. He contends that the juvenile court erred by determining that he was unlikely to become fit within a reasonable time because he had made progress on his treatment plan and maintained a strong bond with the children. Considering this bond, he also contends that a less drastic alternative available existed in the form of an allocation of parental responsibilities (APR) to maternal grandmother.

¶ 7     Mother contends that the juvenile court erred by qualifying the second caseworker, who took over the case shortly before the termination hearing, as an expert witness.

## II.     Termination Criteria and Standard of Review

¶ 8     The juvenile court may terminate a parent's rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the

parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 9    The juvenile court's judgment terminating parental rights presents a mixed question of fact and law involving the application of the termination statute to the evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. The credibility of witnesses and the sufficiency, probative value, and weight of the evidence, as well as the inferences and conclusions to be drawn from it, are within the juvenile court's discretion. *Id.* We review the court's factual findings for clear error and will set them aside only if they lack any support in the record. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. We review the court's legal conclusions de novo. *Id.*

### III.    Father's Appeal

#### A.    Fit Within a Reasonable Time

##### 1.    Preservation

¶ 10    The Department and the guardian ad litem (GAL) contend that father's fitness argument is unpreserved. Divisions of this court have split on the question of whether a parent must preserve issues by raising specific arguments related to each of the statutory criteria or if failing to do so results in a waiver of appellate review as

3

to the criteria not challenged. *Compare People in Interest of S.N-V.*, 300 P.3d 911, 913 (Colo. App. 2011), *with People in Interest of D.P.*, 160 P.3d 351, 355-56 (Colo. App. 2007). We need not decide the preservation issue here because, regardless of whether father was required to preserve his claim, we discern no error.

### 2. Applicable Law

¶ 11    An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *D.P.*, 160 P.3d at 353. Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006). A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 12    In determining whether a parent's conduct or condition is likely to change in a reasonable time and whether the parent can therefore become fit in a reasonable time, the juvenile court may

4

consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of D.L.C.*, 70 P.3d 584, 588-89 (Colo. App. 2003).

¶ 13 The determination of a reasonable period is fact-specific and varies from case to case. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 25. However, a reasonable time is not an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *Id.* at ¶ 24. When a child is under six years old, as in this case, the court must also consider the expedited permanency planning (EPP) provisions, which require that the child be placed in a permanent home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2024.

### 3. Analysis

¶ 14 The juvenile court determined that father was unfit and unlikely to become fit within a reasonable time. In support, the court found that father's compliance with his treatment plan was inconsistent and intermittent. As to father's substance abuse — which the court deemed the "crux" of his treatment plan — the

court found that father was unable to progress on that objective. The court determined that, by not engaging in substance use monitoring or showing success with treatment, father was unable to demonstrate sobriety and thus continued to exhibit the issues that led to the creation of the treatment plan. The court found that inconsistency was an issue when it came to other treatment plan objectives, such as family time and demonstrating an ability to financially support the children. The court explicitly based its finding of unfitness on father's excessive use of intoxicating liquors or controlled substances, which affected his ability to care for the children. *See* § 19-3-604(2)(e), C.R.S. 2024. The court based its determination that father's unfitness was unlikely to change within a reasonable period based on father's inability to maintain sobriety during the case. The court noted that the EPP provisions applied to this case.

¶ 15 The record supports the juvenile court's findings.

¶ 16 Both caseworkers testified that father had not complied with his treatment plan. The court also heard evidence that:

- father admitted to using methamphetamine throughout the case;

- after the first five months of the case, father only occasionally engaged in urinalysis screenings;

- father completed several relapse prevention classes but that did not mitigate ongoing substance abuse issues;

- two months before the termination hearing, father's urinalysis test was positive for methamphetamine;

- father's continued methamphetamine use was a concern for the Department at the time of the hearing;

- while the Department received several positive reports for supervised family time, father did not progress to a lower level of supervision due to concerns about his sobriety and interactions with mother during visits; and

- father had not demonstrated an ability to financially support the children.

¶ 17 The first caseworker testified that the children had been in maternal grandmother's care since the case was opened. At that time, X.H. was a little under two years old and R.C.H. was only days old. The caseworker opined that it was not in the children's best interest to wait any longer for permanency.

¶ 18    Father asserts that he was nonetheless likely to become fit within a reasonable time because the reports from his visits were generally positive and he showed progress on his treatment plan, such as "show[ing] periods of sobriety." While the court heard evidence about father's intermittent progress during the case, also heard ample evidence suggesting father was not able to maintain sobriety throughout the case, and it appropriately relied on that evidence when concluding that father's condition rendered him unlikely to change within a reasonable period of time.  *D.L.C.*, 70 P.3d at 589 (court may consider chronic or long-term nature of parent's condition); *see also People in Interest of K.L.W.*, 2021 COA 56, ¶ 62 (we cannot reweigh the evidence or substitute our judgment for that of the juvenile court).

¶ 19    In addition, this was an EPP case that had been open for nearly two years.  The court was required to permanently place the children as expeditiously as possible because permanency was crucial at their young age.  *See* §§ 19-1-102(1.6), 19-3-702(5)(c).

¶ 20    Because the record supports the juvenile court's findings, we will not disturb its determination that father was unlikely to become fit within a reasonable time.

## B. Less Drastic Alternatives

### 1. Applicable Law

¶ 21 Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must also consider and eliminate less drastic alternatives. *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3); *see L.M.*, ¶ 29. The court may also consider other factors, including whether the alternative placement option favors adoption rather than an APR, *People in Interest of Z.M.*, 2020 COA 3M, ¶ 31, whether an ongoing relationship with the parent would be beneficial or detrimental to the child, and the child's need for permanency, *L.M.*, ¶ 29.

¶ 22 For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *A.M.*, ¶ 27. Therefore, if the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision

9

if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## 2. Analysis

¶ 23 The juvenile court considered an APR to maternal grandmother. However, the court determined that it was "imperative" not to disrupt the young children's attachment with maternal grandmother and that they deserved a permanent home that would not be disturbed in the future. Further, the court determined that an APR allowing father parenting time would confuse the children and not allow them to settle into a primary home. The court found that R.C.H. has "special needs," which may impact his bonding and that it was not in the children's best interests to have disparate outcomes in the case. Lastly, the court considered that maternal grandmother wanted to adopt the children. *See Z.M.*, ¶ 31. Based on all those factors, the court concluded that "termination [wa]s the best available option, over and above [APR]."

¶ 24 The record supports the juvenile court's findings. The court heard testimony that:

- maternal grandmother is the children's primary attachment and the children are "very bonded" to her;

- the children have done well in maternal grandmother's care and are used to their routine;

- maternal grandmother is capable of meeting the children's needs; and

- R.C.H. has several medical needs including a chronic upper respiratory infection, sleep apnea-like episodes, and challenges gaining weight.

Both caseworkers opined that termination was in the best interests of the children.

¶ 25    To be sure, the court heard evidence that father has a bond with the children and that his visits generally went well.  Yet the court determined that continuing his parenting time would be detrimental to the children.  *L.M.*, ¶ 29.  And the court weighed the need for permanency and need to keep the children's primary attachment intact more heavily than the potential benefits of an APR.  *See id.*

¶ 26    To the extent father suggests that an APR to paternal grandmother was a viable less drastic alternative, the court found,

with record support, that it "[c]learly" was not. Paternal grandmother lived in another state, never completed a background check, and was nonresponsive to the Department after two phone conversations.

¶ 27 In sum, the court considered the alternative of an APR to maternal grandmother but ultimately determined — particularly given the children's young age, attachment, and need for permanency — that termination was in their best interests. *A.M.*, ¶ 32. Because the record supports its findings, we must accept its determination. *B.H.*, ¶ 80.

## IV. Mother's Appeal

### A. Preservation

¶ 28 Mother specifically argues that the court erred by qualifying the second caseworker as an expert because (1) his qualifications are insufficient and (2) his work with the family in this case was minimal. She alternatively argues that the probative value of his testimony was substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, and needlessly cumulative evidence.

¶ 29    However, mother's counsel only objected to the caseworker being qualified as an expert based on his "lack of work experience." And he did not object, on any basis, to the caseworker's *testimony*. Because mother preserved only her qualifications argument for review, we address that argument and decline to address the others. *See People in Interest of K.L-P.*, 148 P.3d 402, 403 (Colo. App. 2006) (arguments never presented to, considered by, or ruled on by a trial court may not be raised for the first time on appeal).

### B.    Applicable Law and Standard of Review

¶ 30    CRE 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." A court may qualify an expert witness under any of the five factors specified in CRE 702. *Huntoon v. TCI Cablevision of Colo., Inc.*, 969 P.2d 681, 690 (Colo. 1998). CRE 702 does not impose a bright-line rule requiring a witness to hold any specific credential to testify on a particular issue. *Id.*

¶ 31    The juvenile court has discretion to decide whether a

caseworker qualifies as an expert under CRE 702. *People in Interest*

*of A.E.L.*, 181 P.3d 1186, 1193 (Colo. App. 2008). We review the

court's ruling for an abuse of discretion, *id.*, and we will uphold it

unless it is manifestly arbitrary, unreasonable, or unfair, *Huntoon*,

969 P.2d at 690.

## C.    Analysis

¶ 32    While the juvenile court acknowledged that the second

caseworker's experience was limited, it qualified him as an expert in

child protection casework based on his experience, training, and

certification in casework.

¶ 33    The record shows that the caseworker had served as a

permanency caseworker for approximately a year, completed over

100 hours of training to become a certified caseworker, engaged in

ongoing training, attended regular supervision meetings, and

previously provided expert testimony in an adjudicatory hearing.

His caseworker certification was current at the time of the hearing.

¶ 34    We reject mother's argument that the caseworker lacked

sufficient experience in child protection to be qualified as an expert.

Mother has not directed us to any authority providing that CRE 702

requires a witness to have a specific number of years of experience to be qualified as an expert. *Cf. People v. Lehmkuhl*, 117 P.3d 98, 104 (Colo. App. 2004) (where an expert lacks certain additional qualifications within a field of expertise, such deficiency goes to the weight of the expert's testimony, not its admissibility).

¶ 35    We are also not persuaded by mother's suggestion that the caseworker was unqualified because he did not receive specialized education in child protection and his active caseworker certification was not yet up for renewal. No specific degree or credential is required to be qualified as an expert witness in child protection casework. *Huntoon*, 969 P.2d at 690. Moreover, CRE 702 permits a court to consider multiple factors when determining whether to qualify a witness as an expert, as the court did here by basing the qualification on both training and experience. *See A.E.L.*, 181 P.3d at 1193 (concluding that the court did not abuse its discretion by qualifying caseworkers as experts in social work based on their training and experience); *Huntoon*, 969 P.2d at 690. Based on this record, we conclude that the juvenile court did not abuse its discretion. *See A.E.L.*, 181 P.3d at 1193.

## V.    Disposition

¶ 36    The judgment is affirmed.

JUDGE FOX and JUDGE LUM concur.